RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0396P (6th Cir.)
File Name: 01a0396p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

DONNA COCKREL,
          *Plaintiff-Appellant,*

          *v.*                                          No. 00-5259

SHELBY COUNTY SCHOOL
DISTRICT, et al.,
          *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 98-00040—Joseph M. Hood, District Judge.

Argued: March 9, 2001

Decided and Filed: November 9, 2001

Before: SILER, MOORE, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Matthew L. Mooney, MOONEY, MOONEY &
MOONEY, Lexington, Kentucky, for Appellant. Robert L.
Chenoweth, CHENOWETH LAW OFFICE, Frankfort,
Kentucky, for Appellees. **ON BRIEF:** Matthew L. Mooney,
Eugene F. Mooney, James M. Mooney, MOONEY,
MOONEY & MOONEY, Lexington, Kentucky, for

1

Appellant. John C. Fogle III, CHENOWETH LAW OFFICE, Frankfort, Kentucky, for Appellees.

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. SILER, J. (pp. 36-37), delivered a separate concurring opinion.

————————————

## OPINION

————————————

KAREN NELSON MOORE, Circuit Judge.  Plaintiff Donna Cockrel ("Cockrel") appeals the district court's decision granting the Shelby County Public School District ("School District" or "District"), Superintendent Leon Mooneyhan, and Principal Bruce Slate's (collectively referred to as "defendants") motion for summary judgment with respect to Cockrel's First Amendment retaliation claim, which she brought pursuant to 42 U.S.C. § 1983.  We **REVERSE** and **REMAND** the case to the district court for further proceedings consistent with this opinion.

## I.  BACKGROUND

Plaintiff Donna Cockrel, a tenured fifth-grade teacher at Simpsonville Elementary School in the Shelby County, Kentucky School District was terminated on July 15, 1997 by the District's superintendent, Dr. Leon Mooneyhan.  The School District's proffered grounds for Cockrel's termination were insubordination, conduct unbecoming a teacher, inefficiency, incompetency, and neglect of duty.  As the basis for these charges, the School District detailed seventeen specific instances of misconduct engaged in by Cockrel, including:  failing to teach and disparaging the school's "Just Think" curriculum; calling Principal Harry Slate names in front of staff members and students; and failing to cooperate with the Title I program and the Title I aides in her class, as well as with other faculty members and staff of Simpsonville Elementary School.

While the School District alleged numerous reasons for its decision to terminate Cockrel, she claims that the District fired her due to her decision to invite Woody Harrelson, the television and film actor most famous for his role as "Woody" on the network television show "Cheers," and others to her classroom to give presentations on the environmental benefits of industrial hemp. Hemp, an illegal substance in Kentucky, Ky. Rev. Stat. §§ 218A.1422, 218A.010(14), is a plant from which both marijuana and a valuable fiber can be harvested. There are two varieties of the hemp plant. One is the marijuana plant itself, with approximately four to seven percent of its weight comprised of tetrahydrocannabinol ("THC"), the active chemical in the marijuana drug; the other is industrial hemp, a plant which grows in stalks and from which fibers can be taken to make various goods such as paper and clothes. John Mintz, *Splendor in the Grass?*, Washington Post, Jan. 5, 1997, at H1. Unlike marijuana, the industrial hemp plant is only comprised of between 0.1 and 0.4 percent THC, an insufficient amount to have any narcotic effect. *Id.* Nevertheless, Kentucky law prohibits possession of both varieties of the hemp plant, including "its seeds or resin or any compound, mixture, or preparation which contains any quantity of these substances." Ky. Rev. Stat. §§ 218A.1422, 218A.010(14).

Cockrel claims that on at least three occasions during her seven-year tenure at Simpsonville Elementary she organized outside speakers to come to her class to speak about industrial hemp. Cockrel further claims that both Principal Slate and Superintendent Mooneyhan knew that she organized industrial hemp presentations. While Principal Slate alleges that he never knew industrial hemp was being discussed in Cockrel's class, he does admit that Cockrel's lesson plans, on at least one occasion, specifically mentioned that hemp was to be discussed.

On or about April 9, 1996, following Cockrel's decision to end the 1995-96 school year with a project entitled "Saving the Trees," in which the use of industrial hemp fibers as a

possible alternative to wood pulp was to be discussed, Cockrel was contacted by a representative of the Cable News Network ("CNN") and asked if she would permit CNN's cameras to film her class presentation for use in a larger program on tree conservation. Cockrel claims that she then immediately informed Slate of CNN's potential visit to their school, though Slate does not recall this conversation.

In early May 1996, Joe Hickey, president of the Kentucky Hemp Growers Association, informed Cockrel that Woody Harrelson might visit Kentucky with CNN, and that Harrelson might also visit her classroom. Cockrel claims that she was given no specific information as to when Harrelson might visit her classroom, and that it was not until the morning of May 30, 1996, the last day of the school year, that she was notified that Harrelson would be visiting Simpsonville Elementary School that day. Cockrel informed Principal Slate of the impending visit, and he agreed to allow it, though Slate claims that he was only told that the presentation to be given was about agriculture.

Harrelson arrived at the school later that morning with an "entourage, including representatives of the Kentucky Hemp Museum and Kentucky Hemp Growers Cooperative Association, several hemp growers from foreign countries, CNN, and various Kentucky news media representatives." Appellant's Br. at 4-5. As stated in Cockrel's complaint, Harrelson spoke with the children about his opposition to marijuana use, yet he distinguished marijuana from industrial hemp and advocated the use of industrial hemp as an alternative to increased logging efforts. As part of the presentation, products made from hemp were shown to the children, as were hemp seeds, a banned substance in the state of Kentucky. Harrelson's visit received both local and national media attention. One student who did not have parental permission to be videotaped or photographed by the news media was included by the press in a class photograph with Harrelson.

to the contrary, which makes this a factual issue that cannot be decided by summary judgment.

---

### CONCURRENCE

---

SILER, Circuit Judge, concurring. On the face of it, it appears inappropriate for a fifth grade class to have a celebrity speaker on a matter as complicated as legalizing industrial hemp. It is a matter of public concern in Kentucky, as evidenced by anecdotal illustrations in the majority opinion; nevertheless, matters of public concern may be outweighed by the school's interest in maintaining certain legitimate goals or missions. *See Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.), *cert. denied*, 513 U.S. 947 (1994).

Here, the school might very well have precluded the teacher from allowing Harrelson and others to discuss legalization of industrial hemp before a class of children in a grade school, even where it might be a valid topic in high school or college. One could point out a myriad of subjects appropriate for an older audience that would not promote a valid educational purpose for grade school children. However, the school approved in advance the subject matter and the speaker. It now must pay the penalty for giving prior approval, because it cannot now be heard that such conduct by Cockrel was disruptive.

Likewise, Cockrel's conduct, if true, toward the principal and other teachers may very well have supported a dismissal for cause, but the school took no action toward her for some of this conduct until after the community became agitated following Harrelson's visit. Thus, as the majority opinion relates, the burden is upon the school board to show that the dismissal would have occurred even in the absence of the protected conduct. *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). The district court correctly found that the school board presented evidence to show that Cockrel would have been fired regardless of her protected conduct. Nevertheless, Cockrel has also presented evidence

Following Harrelson's visit and the media attention it garnered, parents and teachers wrote numerous letters to members of the Shelby County School District voicing their concern and dismay regarding the industrial hemp presentation. Several of the letters noted the mixed message the school was sending on drug use as Harrelson's presentation occurred on the same day that many Simpsonville Elementary School students were graduating from the Drug Abuse Resistance Education ("D.A.R.E.") program offered in the school.

Based on the complaints expressed in the letters, Superintendent Mooneyhan decided to initiate an investigation into Cockrel's conduct. Following the investigation, Mooneyhan advised the Kentucky Education Professional Standards Board ("EPSB") that Cockrel had allowed hemp seeds, an illegal substance, to be passed around to students in her class during Harrelson's class visit. The Standards Board, after investigating the matter, ultimately dismissed Mooneyhan's complaint without prejudice, stating that there was an "insufficient basis to warrant [a] certificate revocation action."[1] Joint Appendix ("J.A.") at 288 (EPSB Letter to Cockrel).

In the months following Harrelson's visit, Simpsonville Elementary School adopted a new visitors policy for "controversial" topics that required advance approval by school administration and written consent by students' parents. This policy was put to use when, during the next

---

[1]On September 3, 1996, based on the findings of the investigation, Mooneyhan gave Cockrel a private reprimand both for her conduct during the Harrelson visit and for other inappropriate actions that were discovered. The criticisms specifically pertaining to Harrelson's visit, which were also listed as reasons for her eventual discharge, included: allowing hemp seeds to be passed around to her students; allegedly lying to the administration about when she first learned Harrelson would be coming to visit; failing to have all the visitors associated with the hemp presentation register at the school office; and allowing a student to be photographed by the media without parental permission.

school year, Cockrel informed Slate that Harrelson would be making a second visit to her classroom to discuss industrial hemp. Cockrel met all of the requirements of the new visitors policy, including providing the requisite advance notice to Principal Slate and obtaining permission from the parents of her students for their children to attend the presentation.[2] Slate did not attempt to discourage Cockrel from having another class presentation on industrial hemp, nor did he tell her that Harrelson should not be invited back to the school. According to Cockrel, however, Superintendent Mooneyhan did tell her earlier in the school year that it would not be in her best interests if Harrelson made any more visits to her class. While Harrelson was unable to attend on the day of his scheduled visit, a small group of parents, unaware that Harrelson was not coming, went to the school and "loudly voiced their objections" to Slate about his permitting Harrelson to visit the school a second time. J.A. at 182 (Slate Dep.).

Harrelson rescheduled the visit for the following week, January 29, 1997, and Cockrel again fully complied with the school's visitors policy. Principal Slate again approved Harrelson's visit. This time Harrelson did make an appearance. Harrelson was met by a group of parents outside the school who were protesting his visit. Due to school scheduling problems, Harrelson was only able to speak to the students for a few minutes before the students had to leave for lunch. Harrelson's visit again garnered national media attention from CNN. Principal Slate, who had been asked by CNN for an interview regarding Cockrel's presentations on industrial hemp, chose to issue a written statement instead. In his statement, Slate said the following:

> The media has reported that Ms. Cockrel has experienced problems with Shelby County school officials, including

---

[2]All but one of her students was given permission to attend the Harrelson presentation.

discharge. Rather, on review of a defendant's motion for summary judgment, if the plaintiff has made out the elements of her First Amendment retaliation claim, we must be confident that the defendant's decision to terminate the plaintiff was not based in part upon the plaintiff's decision to speak. In this case, the defendants have not met this burden, and we believe that a genuine issue of material facts exists from which a reasonable jury could conclude that Cockrel would not have been terminated had she not engaged in constitutionally protected activity. Thus, this matter should be resolved at trial rather than at the summary judgment stage.

### III. SUMMARY

For the foregoing reasons, we **REVERSE** the district court's decision granting defendants' motion for summary judgment, and **REMAND** to that court for further proceedings.

In addition, in *Langford*, plaintiff's supervisor appeared ready and willing to terminate plaintiff as soon as plaintiff refused to speak with her about the problems the two were having. Langford was then swiftly terminated after she failed to attend a meeting with Lane in which they were to discuss their dispute. In the current case, there is less evidence that the defendants were sufficiently motivated by Cockrel's conduct apart from her decision to speak when they made their decision to terminate her. In this case, although Mooneyhan cited seventeen charges constituting the basis for Cockrel's termination, several of the proffered reasons provide a less than compelling basis for termination. For example, Mooneyhan cited Cockrel's frequent use of the school's telephone for non-school-related business, her failure to prepare adequate lesson plans for substitute teachers, and her failure to follow the school's visitors policy for the first Harrelson visit. For each of these charges, there is no evidence in the record that Cockrel had ever been disciplined or reprimanded in any way for these violations prior to their inclusion as bases for her termination. Furthermore, while many of the more serious allegations detailed in the termination letter (*i.e.*, calling Principal Slate names and inappropriate displays of anger in class) occurred well before Harrelson came to Simpsonville to speak on industrial hemp, there is no evidence that this misconduct was ever acted upon by any school administrator until after Harrelson made his initial visit. Based on this evidence, we do not believe that the defendants have met their burden at the summary judgment stage of showing that their decision to discharge Cockrel would have been made regardless of her decision to engage in constitutionally protected speech.

We are well aware that Cockrel's decision to speak cannot immunize her from an adverse employment decision arising out of inappropriate workplace behavior unrelated to her protected speech. Similarly, an employer is not immunized from its decision to terminate an employee based on her speech simply because that employee has engaged in other conduct that could have constituted legitimate grounds for

me, regarding her teaching about industrial hemp. I admit that we have had problems, however, not all our concerns are about Ms. Cockrel's teaching about hemp. I have also received complaints about her conduct in other areas. The Shelby County school officials and I do not disapprove of Ms. Cockrel teaching about hemp, *per se*, which we admit has educational value as to its historical and current uses and its potential as an alternative crop. Rather, we have been concerned about the methods Ms. Cockrel has used to present issues regarding hemp to her students.

J.A. at 265 (Statement for CNN) (emphasis in original). Slate's statement then went on to criticize Cockrel's permitting hemp seeds to be passed around to the students at the first presentation, as well as her failure to inform him promptly of Harrelson's first visit, which occurred on the same day as the D.A.R.E. graduation.

In the months following Harrelson's initial visit, and shortly after his second visit in January 1997, Slate sat in on Cockrel's class for purposes of conducting evaluations. That school year, Cockrel was the only tenured teacher at Simpsonville Elementary to be reviewed after two years, whereas tenured teachers in the School District are typically reviewed only once every three years. Slate stated in his deposition that the reason for Cockrel's early review was his perception that things had been "going downhill" between the two of them for the previous two years. J.A. at 159 (Slate Dep.). Slate further explained that Cockrel was neither communicating nor cooperating with him and the rest of the staff and faculty of Simpsonville Elementary, nor was she adequately following the school's curriculum and policies.

Citing examples of this downward trend in Cockrel's attitude and performance, Slate testified that Cockrel did not want Deputy Yeager, the police officer in charge of the D.A.R.E. program at Simpsonville who had spoken out against the Harrelson visits, in her classroom instructing her

students. She asked Slate to find someone else to teach the D.A.R.E. program. Slate further stated that two teachers had approached him to let him know that Cockrel was calling him names outside his presence. In addition, a parent notified Slate that her child had heard Cockrel call Slate a name in class. Slate also noted that there were many times when Cockrel simply refused to speak with him or failed to attend meetings.

In the 1996-97 school year, during and after the news that Harrelson would be visiting her class once again, five students, at their parents' request, were transferred out of Cockrel's class. Each time Slate attempted to inform Cockrel of a student's transfer, Cockrel would refuse to talk with him, sometimes walking right past him when he tried to speak with her, or turning her back to him, or refusing to meet with him in his office when he so requested.

On February 20, 1997, in the wake of Cockrel's decision to continue discussing the benefits of industrial hemp with outside speakers, the Simpsonville Parent Teachers Association ("PTA") adopted a "position statement," which stated, in part:

> In our opinion, Mrs. Cockrel's behavior over the past few months has been inappropriate for a teacher and role model for our children. We feel she violated the professional code of ethics for KY. [sic] school personnel. In our opinion, she can no longer be an effective educator in our system and our children's education would be better served by another teacher.

J.A. at 291 (PTA Position Statement). A little more than a month later, Principal Slate issued a "summative evaluation" of Cockrel's performance, stating that Cockrel did not meet the requisite level of performance in five of the forty-three categories of evaluation. Deficient performance was noted in the following areas: communication with parents regarding student performance and teacher expectations; documentation

This time Langford did agree to meet with Lane, though Langford asked Lane to postpone their meeting until the day after Langford spoke to the Board. Despite their agreement, Langford failed to attend her scheduled meeting with Lane. Langford was then fired.

On review of the district court's grant of summary judgment to the government employer, this court held that the evidence was strong enough for a reasonable jury to state that the employee's speech motivated, at least in part, the defendant's decision to discharge her. *Id*. at 683. Nevertheless, this court then held that, based on the Langford's "rank insubordination" in insulting Lane in front of co-workers and refusing to discuss her employment dispute with Lane despite Lane's requests to do so, the defendants would have terminated Langford regardless of her protected speech. *Id*. at 683-84.

Although the defendants in the case at bar have as much evidence of insubordination and other misconduct upon which to base their decision to discharge as did the defendants in *Langford*, it is less clear in the current case that the defendants would have fired Cockrel even had she not engaged in protected speech. First, in *Langford*, this court acknowledged that, aside from the temporal proximity between Lane's requests to speak with Langford about their problems and Langford's scheduled speaking engagement with the Board of Commissioners, plaintiff had brought forth no evidence showing that Lane was trying to intimidate her into not speaking in front of the Board, nor was there any additional evidence aside from the temporal proximity of the termination and her speech which indicated that the defendants had retaliated against her for speaking. *Id*. at 682. In the current case, Cockrel's testimony regarding the warning she received from Mooneyhan, as well as the materials attached to the summative evaluation, are pieces of evidence that cast more doubt on the defendants' motives in terminating Cockrel than existed in *Langford*.

of Cockrel's allegedly deficient performance in several categories of evaluation, Principal Slate attached numerous documents to the evaluation. Among these documents were several letters from staff and parents criticizing Cockrel's decision to speak on industrial hemp, as well as a position statement adopted by the Simpsonville PTA recommending that Cockrel no longer be permitted to teach at that school based on her conduct associated with the hemp presentations. While in the documents appended to the summative evaluation there is evidence of Cockrel engaging in inappropriate behavior apart from her participation in any industrial hemp presentations, we do not believe that, based on the totality of the evidence in this case, every reasonable juror would conclude that Cockrel would have been terminated notwithstanding her constitutionally protected speech.

The defendants cite to this circuit's decision in *Langford v. Lane*, 921 F.2d 677 (6th Cir. 1991), as support for their contention that they have met their burden of rebutting Cockrel's retaliation claim. We believe, however, that *Langford* is distinguishable. In *Langford*, a nursing home employee was fired after engaging in constitutionally protected activity in speaking about an employment dispute in front of the County Board of Commissioners. *Langford*, 921 F.2d at 678-79. The day before the plaintiff in *Langford* was scheduled to speak, her supervisor (Lane) asked the plaintiff (Langford) to discuss why Langford was so hostile to her (Langford had earlier insulted Lane in front of co-workers) and what Langford planned to say to the Board the next evening. Langford twice refused to engage in discussion, once in front of other employees. After Langford refused to speak with her, Lane asked her supervisor if Lane could fire Langford based on this insubordinate conduct. Lane's supervisor told her that, because he had not witnessed the allegedly insubordinate conduct, he could not make the termination decision for her. Rather than discharge Langford, Lane left a note for Langford to meet with her the following day, the day Langford was scheduled to speak to the Board.

of lesson plans; showing "consistent sensitivity to individual academic, physical, social, and cultural differences and respond[ing] to all students in a caring manner"; ability to build positive relationships within the school and between the school and community; and acting in accordance with laws and with school regulations and procedures. J.A. at 292-97 (Performance Evaluation, Mar. 26, 1997). Attached to the evaluation were several letters from parents complaining about Cockrel's discussion of hemp in class, as well as documentation of other alleged misconduct. Based on this evaluation, Slate recommended to Superintendent Mooneyhan that Cockrel be terminated. Cockrel was terminated by Mooneyhan on July 15, 1997.

The termination letter informing Cockrel of her discharge detailed numerous instances of misconduct, all of which allegedly served as the basis for her discharge. Several of these charges detailed misconduct that occurred well before Harrelson made his initial visit to Simpsonville Elementary. There is no evidence in the record, however, that Cockrel had been reprimanded for such activity prior to Harrelson's visits to her classroom.

As is her right under Kentucky law, Cockrel initially decided to appeal the Superintendent's decision to terminate her. Shortly thereafter, however, she withdrew her appeal.

Pursuant to Ky. Rev. Stat. § 161.120, Superintendent Mooneyhan forwarded on to the EPSB the proffered reasons for terminating Cockrel in case the Board wished to revoke Cockrel's teaching certificate. Following review by the EPSB, Cockrel entered into a written agreement whereby her teaching certificate was surrendered for two years (June 1997 to June 1999) and suspended for two years (July 1, 1999 through June 30, 2001). The agreement stated, in part:

> While Cockrel denies any wrongdoing and further denies that her conduct is in any way a violation of KRS 161.120 and/or the Professional Code of Ethics for

Kentucky School Personnel, she agrees that the evidence, when presented at formal hearing, is such to result in a finding on all charges that her conduct is in violation of KRS 161.120, and the Professional Code of Ethics for Kentucky School Personnel. Therefore, Cockrel believes that it is in her best interest at this time to enter into this Agreed Order.

J.A. at 68-69 (EPSB Agreed Order).

On June 4, 1998, Cockrel filed suit in the United States District Court for the Eastern District of Kentucky. Cockrel brought a claim pursuant to 42 U.S.C. § 1983 in which she alleged that she was terminated in retaliation for exercising her First Amendment right of free speech when discussing the potential environmental benefits of industrial hemp. Cockrel also included a state law breach of contract claim. Following limited discovery, the defendants moved for summary judgment on Cockrel's § 1983 claim and asked that the district court abstain from deciding her state law claim of breach of contract.

The district court agreed to abstain from deciding Cockrel's state law breach of contract claim. As for Cockrel's First Amendment retaliation claim, the district court granted the defendants' motion for summary judgment. In doing so, the district court held that Cockrel's decision to bring in a speaker to discuss industrial hemp constituted conduct that was neither expressive nor intended to convey a particularized message, and thus was not considered protected speech under Supreme Court jurisprudence. The district court further held that Cockrel's decision to discuss industrial hemp as part of the fifth-grade curriculum could be considered nothing more than private speech by a teacher who was communicating in her role as an employee, not as a citizen, and thus did not touch on matters of public concern. Ultimately, the district court concluded that because Cockrel's conduct could not even be considered expressive speech, and because, even if it was speech, her curricular choices did not touch on matters of

reviewing defendant's motion for summary judgment, we are required to view the evidence in the light most favorable to Cockrel, the nonmoving party. This, alone, creates a material fact issue over the extent to which defendants' decision to discharge Cockrel was motivated by her decision to bring industrial hemp advocates to class.

Other, more circumstantial, evidence also weighs in favor of allowing Cockrel to proceed to trial on her retaliation claim. As noted earlier, Principal Slate initiated early evaluations of Cockrel in the 1996-97 school year following Harrelson's first visit on the last day of the prior school year. In addition, Superintendent Mooneyhan's decision to conduct an investigation into Cockrel's conduct was based solely on the parents' and teachers' complaint letters he received following the initial Harrelson visit. There is no evidence in the record that any news of the improper conduct alleged in Cockrel's termination letter, much of which occurred well before Harrelson set foot on the grounds of Simpsonville Elementary, had ever been relayed to the Superintendent before the decision to investigate Cockrel had been made, nor is there any evidence that Cockrel had been disciplined by any school administrator for this conduct before Harrelson arrived on the scene. While many of the allegations made against Cockrel would, if true, amount to serious misconduct on her part, the fact that she was not disciplined for any of this behavior, nor did the Superintendent know of it, until after Harrelson visited and various members of the school community voiced their displeasure with the presentation, leads to a genuine issue of material fact concerning the defendants' assertion that Cockrel would have been fired regardless of her decision to speak on the environmental benefits of industrial hemp.

Also telling is the summative evaluation itself, which Principal Slate testified was the basis upon which he recommended to Mooneyhan that Cockrel be fired, and which Mooneyhan admitted was a factor in his ultimate decision to discharge Cockrel. Mooneyhan Dep. II at 150. As evidence

In the July 15, 1997 termination letter sent by Superintendent Mooneyhan to Cockrel, seventeen reasons were given as the basis for the school district's decision to discharge her. J.A. at 51-55. Among the litany of reasons offered by the defendants for Cockrel's discharge were: her calling Principal Slate names in front of staff members and students;[8] her failure to teach the school's mandatory "Just Think" curriculum; her persistent failure to follow the school's Title I program; her inappropriate language and displays of anger in class; and her general failure to cooperate with other members of the Simpsonville school community, a point which we have already discussed in detail. There is no question that Cockrel's conduct, if it did in fact occur as the defendants allege, was completely inappropriate. Furthermore, we have no doubt that conduct of this nature can serve as adequate grounds for an employee's termination. Despite this, however, after viewing all the evidence in the record in the light most favorable to Cockrel, we do not believe that the defendants have met their significant burden of showing that every reasonable juror would conclude that, even had Cockrel not spoken to her students about industrial hemp, she would have been terminated in any event.

Several pieces of evidence weigh against granting defendants' summary judgment motion. First, Cockrel testified in her deposition that, at the beginning of the 1996-97 school year following Harrelson's first visit to her class, she spoke with Superintendent Mooneyhan about the possibility of Harrelson making a second visit to Simpsonville Elementary. Cockrel claimed that, during the course of this conversation, Mooneyhan told her that it would not be in her best interests if Harrelson made any more visits to her class. J.A. at 104-05 (Cockrel Dep.). While Mooneyhan denies ever making such a statement, Mooneyhan Dep. I at 65, when

---

[8] Mooneyhan's letter to Cockrel describes in detail the names of faculty and staff attesting to Cockrel's profanity-laced remarks directed at Slate.

public concern, she did not have a First Amendment right to discuss industrial hemp in her classroom. Thus, because she had no First Amendment right to speak in this instance, the court concluded that Cockrel had no actionable First Amendment retaliation claim. Cockrel's appeal to this court followed.

## II.  ANALYSIS

We must first address two procedural arguments raised by the appellees that, if successful, would render a review of the merits of Cockrel's First Amendment retaliation claim unnecessary.

### A.  Collateral Estoppel

The defendants first argue that, because Cockrel failed to appeal the Superintendent's decision to terminate her, as was her right under Kentucky law, she is collaterally estopped from challenging her dismissal in this court. As this circuit has explained, collateral estoppel, otherwise known as issue preclusion, "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided." *Barnes v. McDowell*, 848 F.2d 725, 728 n.5 (6th Cir. 1988), *cert. denied*, 488 U.S. 1007 (1989). The *Barnes* court further explained that federal courts must give the factual findings of a state agency that is acting in a judicial capacity preclusive effect if such findings would have preclusive effect in the State's courts. *Id*. at 730 (citing *University of Tennessee v. Elliott*, 478 U.S. 788, 796-98 (1986)). Kentucky courts give preclusive effect to factual findings in a previous proceeding "'only as to matters which were necessarily involved and determined in the former action," as opposed "to matters which were immaterial or unessential to the determination of the prior action or which were not necessary to uphold the judgment.'" *Barnes*, 848 F.2d at 730-31 (quoting *Sedley v. City of West Buechel*, 461 S.W.2d 556, 558 (Ky. 1970)).

In this case, the question of whether Cockrel was terminated in retaliation for the exercise of her First

Amendment rights was not resolved by any prior state proceeding. As Cockrel notes in her reply brief, "[t]here was no hearing on any issue involved in this action. There are no state court or administrative findings on any factual matters involved here." Appellant's Reply Br. at 13. Even if the appeals board had decided that the reasons proffered by the defendants for Cockrel's discharge were adequate to support the termination and that there was substantial evidence of defendants' proffered reasons in the record, unless Cockrel raised her retaliation claim, it would not have decided, nor even considered, whether the true motivation of defendants' actions was to retaliate against her for exercising her free speech rights. *See Barnes*, 848 F.2d at 731. Thus, because Cockrel's First Amendment retaliation claim was not addressed in any prior proceedings, issue preclusion does not prevent her federal suit. *Id.*

## B. Cockrel's Motion to Reconsider

As defendants note in their brief, Cockrel failed to respond to their motion for summary judgment within the requisite time period.[3] The district court, without benefit of any response by plaintiff, issued its memorandum and order granting defendants' motion for summary judgment on January 28, 2000. On February 2, 2000, Cockrel filed a motion with the district court asking it to reconsider and set aside the issuance of its order granting summary judgment in

---

[3]The defendants filed their motion for summary judgment by mail on December 30, 1999, thus giving Cockrel eighteen days to file her response (*i.e.*, the fifteen days to respond allotted by local rules of the Eastern District of Kentucky plus three additional days pursuant to Fed. R. Civ. P. 6(e) because she was served with the motion by mail). Thus, Cockrel's response was due by January 17, 2000. On January 18, 2000, Cockrel's attorney obtained defense counsel's agreement that time be enlarged an additional thirty days to respond to the defendants' motion. Nevertheless, by the time Cockrel's counsel could put the agreement in writing and circulate it to opposing counsel for his signature, the district judge, on January 28, 2000, issued his ruling on the motion for summary judgment.

### 3. Rebutting the Plaintiff's First Amendment Retaliation Claim

Because Cockrel has successfully established for purposes of the summary judgment stage the three elements of her First Amendment retaliation claim, the burden of persuasion shifts to the defendants. As stated earlier, to defeat the plaintiff's claim at trial, the defendants must show by a preponderance of the evidence that they would have terminated Cockrel even had she not engaged in constitutionally protected activity. *Leary*, 228 F.3d at 737. To defeat plaintiff's claim on a motion for summary judgment, however, a substantially higher hurdle must be surpassed, particularly where, as is the case here, the moving party bears the ultimate burden of persuasion on this issue at trial. 11 James William Moore et al., Moore's Federal Practice § 56.13[1], at 56-138 (3d ed. 2000) (stating that, if the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."). To merit summary judgment in their favor, the defendants may not simply bring forth enough evidence to allow a jury to find that they would have terminated Cockrel regardless of her speech. Rather, in reviewing a motion for summary judgment, we must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita*, 475 U.S. at 587, and "[s]ummary judgment in favor of the party with the burden of persuasion . . . is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999). Thus, because plaintiff has established the elements of her claim for First Amendment retaliation, summary judgment for the defendants is proper only if the evidence is such that *every* reasonable juror would conclude that the defendants have met their burden of showing that Cockrel would have been terminated even had she not spoken to her class about the merits of industrial hemp.

reasonable factfinder to conclude, by a preponderance of the evidence, that her speech, at least in part, motivated the defendants to discharge her. *Id.*

Although there certainly is significant evidence that Cockrel's behavior at school, apart from the industrial hemp presentations, was often inappropriate, we believe that Cockrel has presented enough evidence such that a reasonable jury could find that the defendants, in terminating her, were at least partially motivated by her decision to speak on industrial hemp. Several pieces of evidence work in her favor. First, Principal Slate initiated early evaluations of Cockrel in the 1996-97 school year following Harrelson's first visit to her class on the last day of the 1995-96 school year. In the 1996-97 school year, Cockrel was the only tenured teacher Slate reviewed on a schedule of more than one evaluation for every three years. In addition, based on the parents' and teachers' complaint letters following the initial Harrelson visit, Superintendent Mooneyhan initiated an open-ended investigation into Cockrel's school conduct. Finally, the deposition testimony shows that the March 1997 summative evaluation served as the basis upon which Principal Slate recommended to Mooneyhan that Cockrel be fired, and was also a factor in Mooneyhan's ultimate decision to terminate Cockrel. Attached to this evaluation were several letters from parents and staff critical of Cockrel's decision to teach her students about industrial hemp.

After examining this evidence, we conclude that a jury could find, by a preponderance of the evidence, that the defendants' decision to discharge Cockrel was motivated, at least in part, by her decision to teach her students about industrial hemp. The temporal proximity between the Harrelson visits and Cockrel's series of unscheduled evaluations, as well as the influence the parent and teacher complaints appeared to have on the defendants in the wake of the Harrelson visits, constitute sufficient evidence for Cockrel to establish the causation element of her First Amendment retaliation claim.

light of the parties' agreement to enlarge time an additional thirty days so that plaintiff could respond to defendants' motion for summary judgment. The district court denied this motion, stating that "[i]t remains clear to this Court that Plaintiff's selection of industrial hemp as part of her classroom curriculum is not a form of speech entitled to protection by the First Amendment." J.A. at 41 (Dist. Ct. Order, Feb. 14, 2000). The court further stated that, in light of the law discussed in its memorandum granting summary judgment, "[p]ermitting Plaintiff to file a belated response would be an exercise in futility." J.A. at 42.[4]

Motions for reconsideration filed within ten days of the district court's final judgment, as this one was, are generally treated as a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e). 12 James Wm. Moore et al., Moore's Federal Practice § 59.30[7] (3d ed. 2000). While this court generally reviews the denial of a Rule 59(e) motion to alter or amend a judgment for an abuse of discretion, a de novo standard of review is applied when the Rule 59(e) motion seeks review of a grant of summary judgment. *Smith v. Wal-Mart Stores, Inc.*, 167 F.3d 286, 289 (6th Cir. 1999).

Indeed, because the district court was not exercising its discretion in refusing to allow Cockrel's response, but instead was stating, as a matter of law, that any response by the plaintiff would be futile, we apply a de novo standard of review to this legal conclusion. We now turn to the merits of the case in order to evaluate the district court's finding of futility. As will be discussed later, not only is it clear that Cockrel's decision to bring in speakers advocating the use of industrial hemp is protected speech under the First

_____

[4]Although Cockrel did not submit arguments on the merits of her claims in her motion to reconsider, the district court did not fault her for this omission. Instead, the sole basis for its denial of Cockrel's motion was the futility of her claims in light of the court's prior legal conclusion that Cockrel's decision to teach her students about industrial hemp was not protected speech under the First Amendment.

Amendment, but her First Amendment retaliation claim is strong enough to survive the defendants' motion for summary judgment. Thus, the district court's denial, on futility grounds, of Cockrel's Rule 59(e) motion to reconsider its judgment was error.

## C. Cockrel's First Amendment Retaliation Claim

### 1. Standard of Review

This court reviews de novo a district court's decision to grant summary judgment. *Miller v. Am. Heavy Lift Shipping*, 231 F.3d 242, 246 (6th Cir. 2000). Summary judgment may be granted only if there are no genuine issues of material fact and one party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the district court's decision to grant summary judgment, we view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 2. The Elements of a First Amendment Retaliation Claim

Donna Cockrel, a teacher in the Shelby County Public School District, is a public employee. For a public employee to establish a claim of First Amendment retaliation, this court has held that she must demonstrate:

(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

examination of the remainder of the elements of plaintiff's First Amendment retaliation claim.

### c. Did the Plaintiff Suffer an Injury as a Result of Her Speech That Would Chill an Ordinary Person From Continuing to Engage in Such Speech?

For the next element of Cockrel's retaliation claim, she must show "that the defendant[s'] adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity[.]" *Leary*, 228 F.3d at 737. There is no question that, by being terminated, Cockrel has suffered an injury that would chill an ordinary person from continuing to engage in speech on the environmental benefits of industrial hemp.

### d. Was the Decision to Terminate Cockrel Motivated, at Least in Part, by Plaintiff's Decision to Speak About Industrial Hemp?

The final element of Cockrel's First Amendment retaliation claim requires her to show that defendants' decision to discharge her was motivated, at least in part, by the exercise of her free speech rights. *Id*. This circuit has stated that "the nonmoving party may not rely on the mere fact that an adverse employment action followed speech that the employer would have liked to prevent. Rather, the employee must link the speech in question to the defendant's decision to dismiss her." *Bailey*, 106 F.3d at 145 (citation omitted). In other words, to survive defendants' motion for summary judgment, Cockrel must present sufficient evidence to allow a

consistently applied to cases of teacher speech in this circuit. *See, e.g., Bonnell*, 241 F.3d at 821 (applying *Pickering* to a college professor's speech); *Leary*, 228 F.3d at 737-38 (applying *Pickering* to elementary school teachers' speech). We see no reason to part from *Pickering* when deciding cases involving a teacher's in-class speech, nor have either of the parties in this case argued that *Pickering* should not apply.

presentation. We do not believe that defendants can use the outcry within the school community protesting Cockrel's speech, speech that was approved by school officials in advance, as a shield for their decision to discharge her. While ordinarily we would give substantial weight to the government employer's concerns of workplace efficiency, harmony, and discipline in conducting our balancing of the employee's and employer's competing interests, we cannot allow these concerns to tilt the *Pickering* scale in favor of the government, absent other evidence, when the disruptive consequences of the employee speech can be traced back to the government's express decision permitting the employee to engage in that speech.[6]

Accordingly, we hold that, on balance, the defendants' interests in an efficient operation of the school and a harmonious workplace do not outweigh the plaintiff's interests in speaking about the benefits of industrial hemp, an issue of substantial political and economic concern in Kentucky. Thus, because Cockrel's speech touches on matters of public concern and because the balancing of interests under *Pickering* weighs in her favor, her speech is constitutionally protected.[7] We now proceed with an

---

[6] This circuit has noted, with minimal explanation, that an unconstitutional dilemma may exist for a teacher whose controversial speech is approved ex ante by school officials, but used ex post, in the wake of parental and or community dismay with that speech, as the reason for the teacher's discharge. *Stachura v. Truszkowski*, 763 F.2d 211, 213-15 (6th Cir. 1985), *rev'd on other grounds*, 477 U.S. 299, 303-04 (1986).

[7] Rather than apply *Pickering*, several circuits have chosen to apply the Supreme Court's analysis of students' in-class speech rights in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), to cases in which teachers' in-class speech rights are at issue. *See Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994), *cert. denied*, 515 U.S. 1160 (1995); *Miles v. Denver Pub. Schs.*, 944 F.2d 773, 777 (10th Cir. 1991); *Bishop v. Aronov*, 926 F.2d 1066, 1074 (11th Cir. 1991), *cert. denied*, 505 U.S. 1218 (1992). The *Pickering* balancing analysis has been

---

*Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). To demonstrate that she was engaging in constitutionally protected speech, Cockrel must show that her speech touched on matters of public concern, and that her "interest in commenting upon matters of public concern . . . outweigh[s] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quotation omitted); *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 144 (6th Cir. 1997) (same). If the plaintiff can establish the three elements of her First Amendment retaliation claim, the burden of persuasion then shifts to the defendants, who must show, by a preponderance of the evidence, that they "would have taken the same action even in the absence of the protected conduct." *Leary*, 228 F.3d at 737 (quotation omitted).

### a. Was This Speech?

Before deciding whether Cockrel's speech was constitutionally protected, this court must first address the question of whether Cockrel's activity can be considered speech at all. The district court's decision disposing of Cockrel's First Amendment claims appears to be based on two separate theories that the court uses interchangeably. First, the district court stated that Cockrel's decision to bring in a speaker who would give a presentation on industrial hemp should not be considered speech. The district court further held that a teacher's decisions regarding the content of the curriculum she will teach to her class, even if considered speech, is still not protected by the First Amendment. We put the second holding aside for a moment and turn to the first.

The district court held that, because Cockrel simply chose to bring in speakers who would talk about industrial hemp, rather than speaking on the matter herself, "[h]er free speech claim is based solely on conduct." J.A. at 31 (Dist. Ct. Mem. Op.). Also influential in the district court's decision was its notion that, in staging an industrial hemp presentation, Cockrel was not intending to convey a "particularized

message," nor was she advocating or speaking against hemp's use as an environmental alternative to cutting down trees. J.A. at 35 (Dist. Ct. Mem. Op.) (quotation omitted).

Regardless of the reasoning upon which it relied, the district court erred in holding Cockrel's conduct not to be speech. First, to the extent the district court was persuaded that Cockrel's actions did not constitute speech because Woody Harrelson, rather than Cockrel, was doing the speaking, this was error. As the Supreme Court stated in *Hurley v. Irish-American Gay, Lesbian & Bisexual Group*, 515 U.S. 557, 570 (1995), to receive First Amendment protection, a speaker does not have "to generate, as an original matter, each item featured in the communication." For example, cable operators, even though they only broadcast material written, spoken, and produced by others, are still considered to be engaged in protected speech. *Id.* (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994)). The same First Amendment protections exist for newspapers, which in their opinion pages simply collect and present the speech of others. *Hurley*, 515 U.S. at 570. We see no reason, nor have the defendants explained to this court, why a teacher's selection of a speaker for an in-class presentation is less a form of speech than a cable operator's decision as to which programs it chooses to present to its viewing audience.

To the extent that the district court relied on the argument that Cockrel's conduct was not speech because she had no advocative purpose when bringing industrial hemp enthusiasts to her class, this was also error. The Supreme Court has held that films, radio programs, and live entertainment are all protected by the First Amendment. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). Moreover, to have constitutional protection, those who choose to show the film or stage the play need not show that they intended to convey a particularized message in doing so, nor that they approved or disapproved of its content, for such activities are inherently expressive and entitled to constitutional protection. *Id.*

officer Yeager's criticism of the Harrelson visits, Cockrel no longer wanted the officer in her classroom instructing her students. Cockrel asked Slate to find a replacement for Yeager as well. Cockrel's termination letter detailed several instances of disputes Cockrel had with co-workers, including an instance in which Cockrel jerked a phone away from a co-worker who had signed one of the letters speaking out against the Harrelson visit, and an incident in which Cockrel told two co-workers "not to waste their breath after they said 'good morning' to [her.]" J.A. at 54, 245-46. At least one of these co-workers had also signed a letter critical of Cockrel's decision to speak about industrial hemp.

Many parents and members of the school community also expressed great concern over Cockrel's decision to invite speakers to her class who advocated the use of industrial hemp. Parents wrote letters to Principal Slate and Superintendent Mooneyhan in opposition to Cockrel's industrial hemp presentations, and a small number came to Simpsonville Elementary to protest on the final two occasions Harrelson was scheduled to visit. In addition, the PTA passed a position statement recommending that Cockrel no longer teach in the Shelby County School District.

Although this evidence of a contentious and periodically disrupted work environment weighs in favor of the defendants, the amount of weight we should give this evidence is an entirely different question. We are troubled by the fact that, whereas school officials gave plaintiff prior approval to host all three of the industrial hemp presentations at issue in this case, defendants now forward concerns of school efficiency and harmony as reasons supporting their decision to discharge Cockrel. Principal Slate approved all of Harrelson's scheduled visits in advance, and Slate openly stated that he had no problem with Cockrel teaching her students about industrial hemp. Cockrel also met the conditions of the new visitors policy implemented after the initial Harrelson visit, including obtaining the permission of each student's parents before a child could participate in the

and thus the defendants will have to make a stronger showing that their interests in regulating plaintiff's speech outweighed Cockrel's interests in speaking.

Weighing in plaintiff's favor in this analysis is the fact that her speech substantially involved matters of significant public concern in Kentucky. Defendants claim, however, that their "interest in maintaining loyalty, efficient operation of the schools, and workplace harmony" outweighs the plaintiff's interest in speaking about industrial hemp. Appellees' Br. at 27. We first note that the defendants do not claim that Cockrel's presentations on industrial hemp meaningfully interfered with the performance of her teaching duties. Defendants would have a difficult time making this argument, however, considering they openly acknowledged in a public statement to CNN that there was "educational value" in teaching students about industrial hemp as an alternative crop. J.A. at 265 (Statement for CNN). We further note that defendants' purported interest in "maintaining loyalty" is inapposite in this case. While this circuit has stated that it would consider in its balancing whether employee speech operated to "destroy the relationship of loyalty and trust required of confidential employees[,]" *Williams*, 24 F.3d at 1536, a public school teacher, we believe, is hardly the type of confidential employee the court had in mind. Thus, any loyalty concerns that the defendants may have will not be taken into consideration in our weighing of the competing interests at stake.

Turning to the defendants' proffered interests in an efficient operation of the school and a harmonious work environment, there is evidence that plaintiff's speech has led to problems in both of these areas. For example, following Harrelson's first visit to Simpsonville, numerous members of the school's faculty and staff circulated and or signed letters addressed to school officials criticizing Cockrel's actions in advocating the use of industrial hemp to her students. Cockrel thereafter expressed her displeasure with her co-workers' sentiments on several occasions. As discussed earlier, following D.A.R.E.

The district court points to Judge Milburn's concurring opinion in *Fowler v. Board of Education*, 819 F.2d 657 (6th Cir.), *cert. denied*, 484 U.S. 986 (1987), in support of its argument that Cockrel's conduct should not be considered speech. In *Fowler*, a high school teacher, at the request of her students, showed them *Pink Floyd--The Wall*, an "R"-rated film containing nudity and a great deal of violence, on the last day of school while she completed grade cards. *Id*. at 658-59. The teacher was later terminated for showing the film. The teacher then brought suit, claiming that she was terminated in retaliation for exercising her First Amendment rights.

Judge Milburn, writing only for himself on the issue of whether the conduct of showing the film to the class constituted protected speech, stated that, because the teacher had never seen the movie before and had no idea of its content, her decision to show the film could not be considered "expressive or communicative" in nature. *Id*. at 662-64. Thus, Judge Milburn concluded, the teacher's conduct in showing the film was not entitled to First Amendment protection. *Id*.

Judges Peck and Merritt disagreed with Judge Milburn's analysis of whether the teacher's showing of a film could be considered speech. *Id*. at 667, 669-70. Judge Peck, while concurring in the outcome of the case, stated that the expressive conduct cases used by Judge Milburn to analyze the teacher's showing of the film were "inapposite." *Id*. at 667. Judge Merritt, noting that books, movies, and music that are purely for entertainment value still receive First Amendment protection, argued that the teacher's decision to show the film clearly was protected speech. *Id*. at 669-70.

While Judge Milburn's analysis in *Fowler* is not binding on this court, even if it were, the facts of this case are clearly distinguishable from *Fowler*. Unlike the teacher's showing of a film the content of which she knew nothing about, Cockrel's decision to bring in industrial hemp advocates did have an intent to convey a particularized message. Cockrel,

who in her complaint states that "[s]he was a teacher trainer in the state sponsored Kentucky Agriculture and Environment in the Classroom project from 1993 to 1997[,]" worked at designing methods to integrate agricultural topics into her fifth-grade curriculum. J.A. at 9 (Compl.). She had, on at least three occasions before the Harrelson visit, brought in speakers who advocated the use of industrial hemp to conserve trees and other natural resources. Viewing the facts in the light most favorable to Cockrel, we cannot state, as the district court did, that it was not until "some point during or after the presentation [that] Plaintiff may have developed an approval or disapproval of the use of industrial hemp[.]" J.A. at 36-37 (Dist. Ct. Mem. Op.). Instead, the evidence shows that Cockrel was well aware of the arguments for industrial hemp, and that this was a message she wanted delivered to her students.

Thus, while we believe that Cockrel had an advocative purpose in bringing in speakers who presented her students with information on the environmental benefits of industrial hemp, even if Cockrel did not have such a purpose when organizing these presentations, her decision to present these speakers to her class still constitutes speech.

### b.  Is Cockrel's Speech Constitutionally Protected?

Given our determination that Cockrel's decision to bring industrial hemp advocates into her class is speech, the next question we must ask is whether that speech is constitutionally protected. As stated earlier, speech of a public employee is protected by the First Amendment only if it touches on matters of public concern, and only if "the employee's interest in commenting upon matters of public concern . . . outweigh[s] the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Leary*, 228 F.3d at 737 (quotation omitted). If Cockrel's speech cannot meet both of these standards, then her First Amendment retaliation claim cannot go forward.

#### ii.  *Pickering* Balancing

Having held that Cockrel's speech touches on matters of public concern, we must now weigh the employee's interest in speaking against the employer's interest in regulating the speech to determine if the speech is constitutionally protected. In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court endeavored to strike a balance between a public employee's speech rights on matters of public interest (in that case a public school teacher's speech outside of school) and the State's interest as an employer in maintaining a productive workplace. In accordance with the balancing test created in *Pickering*, public employee speech, even if touching on matters of public concern, will not be constitutionally protected unless the employee's interest in speaking on these issues "outweigh[s] 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary*, 228 F.3d at 737 (quoting *Pickering*, 391 U.S. at 568)). In striking the balance between the State's and the employee's respective interests, this court has stated that it will "consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.), *cert. denied*, 513 U.S. 947 (1994) (citing *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

Before engaging in a "particularized balancing" of the competing interests at stake in this case, *Connick*, 461 U.S. at 150, it is important to note that "if an employee's speech substantially involve[s] matters of public concern, an employer may be required to make a particularly strong showing that the employee's speech interfered with workplace functioning before taking action." *Leary*, 228 F.3d at 737-38 (quotation omitted). In this case, it is clear that Cockrel's speech did substantially involve matters of public concern,

employee were acting out of a private motive with no intent to air her speech publicly, as was the case with Myers, so long as the speech relates to matters of "political, social, or other concern to the community," as opposed to matters "only of personal interest," it shall be considered as touching upon matters of public concern. *Id*. at 146-49.

In Cockrel's case, although she was speaking in her role as an employee when presenting information on the environmental benefits of industrial hemp, the content of her speech, as discussed *supra*, most certainly involved matters related to the political and social concern of the community, as opposed to mere matters of private interest. Thus, contrary to the analyses in *Boring* and *Kirkland*, we hold that Cockrel's speech does touch on matters of public concern.[5]

---

[5]While Cockrel, in teaching her students about the environmental benefits of industrial hemp, was arguably speaking both as an employee and as a citizen, we do not believe that this case is best analyzed as a "mixed speech" case. *See Bonnell v. Lorenzo*, 241 F.3d 800, 811-12 (6th Cir. 2001). In mixed speech cases, the employee at issue speaks not only as both a citizen and an employee, but the content of her speech involves matters of both public and private concern. *See id*. In this case, while the very nature of Cockrel's profession entails that her speech on matters of political and social interest is likely to be made both as an employee and a citizen, the content of her speech is not mixed. Instead, rather than concerning, in part, an employee grievance or some other private dispute, as was the case with the professor's speech in *Bonnell*, Cockrel's speech relates to matters particularly of public concern. Even if we were to apply the mixed speech analysis, so long as "any part of an employee's speech, which contributes to the discharge, relates to matters of public concern, the court must conduct a balancing of interests test as set forth in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)." *Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 411 (6th Cir. 1994). As we will discuss in more detail later, because Cockrel's speech does relate to matters of public concern, and because this speech, at least in part, contributed to her discharge, a balancing of interests under *Pickering* is in order.

### i. Does Cockrel's Speech Touch on a Matter of Public Concern?

In determining whether Cockrel's speech touched on a matter of public concern, we turn to *Connick v. Myers*, 461 U.S. 138 (1983), the Supreme Court's most instructive case on this issue. In *Connick*, the Court stated that matters of public concern are those that can "be fairly considered as relating to any matter of political, social, or other concern to the community[.]" *Id*. at 146. There is no question that the issue of industrial hemp is a matter of great political and social concern to many citizens of Kentucky, and we believe that Cockrel's presentations clearly come within the Supreme Court's understanding of speech touching on matters of public concern.

In support of this conclusion, we first turn to the district court's opinion, which unequivocally stated "that the issue of industrial hemp is politically charged and of great concern to certain citizens." J.A. at 36 (Dist. Ct. Mem. Op.). Second, in the past year alone, industrial hemp advocacy in Kentucky has made news on several occasions, revealing the significant extent to which industrial hemp has become an important and publicly debated issue in the State. In October, presidential candidate Ralph Nader, in a campaign stop in Kentucky, spoke out in favor of the legalization of industrial hemp and of the benefits it would have for small family farmers. Al Cross, *Nader Blasts Foes in Visit to Louisville*, The Courier-Journal (Louisville, KY), Oct. 12, 2000, at A1. In December, after the Drug Enforcement Agency confiscated industrial hemp being grown on the Pine Ridge, South Dakota Indian Reservation, members of the Kentucky Hemp Growers Association, including former Kentucky governor Louie B. Nunn, traveled to South Dakota and, in a ceremony at the base of Mount Rushmore, delivered legally imported industrial hemp to the tribe as a sign of its solidarity. David Melmer, *Kentucky Hemp Farmers Aid Pine Ridge, S.D., Indians After Crop Destruction*, Knight-Ridder Trib. Bus. News, Dec. 11, 2000. These examples only scratch the

surface of the extent to which industrial hemp has become an issue of contentious political and economic debate in Kentucky.

While discussion of industrial hemp plainly meets the broad concept of "public concern" as defined by the Supreme Court, some courts have focused on other portions of the Supreme Court's *Connick* decision in concluding that a teacher's classroom speech does not touch on matters of public concern. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 368-69 (4th Cir.) (en banc), *cert. denied*, 525 U.S. 813 (1998); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 797-99 (5th Cir. 1989), *cert. denied*, 496 U.S. 926 (1990). These cases pay particular attention to the following portion of the *Connick* Court's holding:

> [W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.

*Connick*, 461 U.S. at 147. Based upon this language, the Fourth and Fifth Circuits have determined that a teacher, in choosing what he will teach his students, is not speaking as a citizen, but rather as an employee on matters of private interest. *Boring*, 136 F.3d at 368-69; *Kirkland*, 890 F.2d at 800.

We believe that the Fourth and Fifth Circuits have extended the holding of *Connick* beyond what the Supreme Court intended. Under the courts' analyses in *Boring* and *Kirkland*, a teacher, regardless of what he decides to include in his curriculum, is speaking as an employee on a private matter. *Boring*, 136 F.3d at 368-69; *Kirkland*, 890 F.2d at 800. This essentially gives a teacher no right to freedom of speech when teaching students in a classroom, for the very act of teaching

is what the employee is paid to do. Thus, when teaching, even if about an upcoming presidential election or the importance of our Bill of Rights, the Fourth and Fifth Circuits' reasoning would leave such speech without constitutional protection, for the teacher is speaking as an employee, and not as a citizen.

The facts in *Connick* indicate that the Fourth and Fifth Circuits have read the Supreme Court's language too broadly. In *Connick*, an assistant district attorney, following a disagreement with a supervisor, prepared a questionnaire seeking the opinions of her co-workers on issues such as "office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns." *Connick*, 461 U.S. at 141. Connick was later fired for circulating the questionnaire on the grounds of insubordination. *Id.* The Court held that, while many of the questions simply reflected the plaintiff's efforts to gather information to use against her supervisors in her private employment dispute, Myers's question regarding the pressure to work on political campaigns *did* touch on a matter of public concern. *Id.* at 149. Thus, the Court held that, even though Myers was speaking as an employee out of her private interest in combating her supervisors' decision to transfer her, the fact that one of her questions dealt with the fundamental constitutional right not to be coerced into campaigning for a political candidate was enough to make this particular issue touch on a matter of public concern. *Id.*

If the Fourth and Fifth Circuits' interpretation of *Connick* were correct, then any time a public employee was speaking as an employee, like Myers was when she asked her question about employees being pressured to campaign, the speech at issue would not be protected. As the Supreme Court made clear in its analysis, however, the key question is not whether a person is speaking in his role as an employee or a citizen, but whether the employee's speech in fact touches on matters of public concern. *Id.* 148-49. Thus, even if a public