No. 02–1478.

United States Court of Appeals,
Sixth Circuit.

Jan. 23, 2004.

Abby RAHN, Plaintiff–Appellant,

v.

Juris KAPS, Van Buren County Prosecuting Attorney, in his individual and official capacity; Lynn Ann Bullard, Van Buren County Friend of the Court, in her individual and official capacity; Van Buren County; Van Buren County Board of Commissioners, in their official capacities; Calvin Teague, Van Buren County Administrator, in his individual and official capacity; Sharon Deja, State Court Administrator's Office Manager, in her individual and official capacity, Defendants–Appellees.

Mark Granzotto, Royal Oak, MI, for Plaintiff–Appellant.

Mary Massaron Ross, Plunkett & Cooney, Detroit, MI, Michael S. Bogren, Robert Allan Callahan, Plunkett & Cooney, Kalamazoo, MI, Margaret A. Nelson, Patrick J. O'Brien, Asst. Atty. General, Lansing, MI, for Defendants–Appellees.

Before: ROGERS and COOK, Circuit Judges; and COHN, District Judge.[*]

ROGERS, Circuit Judge.

Abby Rahn, a former assistant prosecutor in Van Buren County, Michigan, appeals the grant of summary judgment in favor of her former employer Juris Kaps, the Prosecuting Attorney of Van Buren County; Lynn Ann Bullard, the Van Buren County Friend of the Court; Sharon Deja of the State Court Administrator's Office; Calvin Teague, the Van Buren County Administrator; the Van Buren County Board of Commissioners, and the county itself. Rahn's lawsuit, predicated on 42 U.S.C. § 1983 and the First and Fourteenth Amendments, alleged that she was terminated from her position as an assistant prosecutor because she engaged in protected speech activity. The issue presented in this appeal is whether the termination of Rahn's employment passes muster under the balancing test articulated by the Supreme Court's decisions in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708(1983). We find that it does, and we therefore affirm the judgment of the district court.

## BACKGROUND

*1. Rahn's Work as Family Law Prosecutor*

Rahn began her tenure as an Assistant Prosecuting Attorney in Van Buren County, Michigan, in 1982. Her earliest duties involved seeking child support orders against parents on behalf of the Prosecuting Attorney. During her service in this position. Rahn generally took steps to establish legal paternity and would seek the entry of a child support order once paternity was conclusively established. Rahn's position required her to work closely with staff from the Office of Child Sup-

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

port ("OCS") and the Van Buren County Friend of the Court office ("FOC").

The parties do not dispute that Rahn had a historically rocky relationship with her supervisors and co-workers, which deteriorated further in the mid-to-late 1990's, when Kaps, Bullard and, the staff of the state court system began to explore ways to merge the prosecutorial functions of the FOC and the Prosecuting Attorney's Office in child support and paternity matters. Early on in this process, Rahn began to voice concerns about the ethical implications of such a merger. Rahn was concerned that the restructuring would place prosecuting attorneys responsible for child support and paternity matters in an impermissible conflict of interest because they would be supervised directly by agents of the same court that adjudicates child support and paternity matters. After Rahn's initial objections were rejected or disregarded, she began to resist changes resulting from the merger by refusing to cooperate with FOC staff.

## 2. Rahn's Letter Writing Activity

In November of 1996, Kaps reprimanded Rahn in writing for her refusals to cooperate with FOC staff members. In the reprimand, Kaps instructed Rahn to cooperate fully with the FOC and to report to him weekly on the productivity of her office. Kaps asked Rahn to put her concerns about the handling of child support and paternity matters behind her and focus on fulfilling the duties of her position. Rahn, however, refused to accept this letter as the conclusion of the matter.

On March 3, 1997, using the letterhead of the Van Buren County Prosecutor, Rahn wrote a memorandum to John Carpenter of the St. Joseph's County Prosecutor's Office. The memorandum outlines a series of arguments against placing the prosecutor's child support and paternity responsibilities under FOC supervision. On March 17, 1997, using the prosecutor's letterhead. Rahn wrote a letter to Wallace Dutkowski, the Director of OCS, objecting to the new structure in place in Van Buren County and protesting the possible imposition of a similar structure in St. Joseph's County.

By the summer of 1999, however, the opinions of many state officials on the matter were running contrary to Rahn's. The merger of prosecutorial and FOC duties in St. Joseph's County that Rahn had protested in 1997 was, in fact, representative of a sea change in the way in which Michigan counties handled child support and paternity matters. After the State Court Administrator's Office recommended to Van Buren County officials that the FOC and Prosecuting Attorney's office totally merge their child support and paternity functions, Kaps informed Rahn that her job was being absorbed into the FOC and that she would be transferred to the Criminal Division of the Prosecutor's Office.

## 3. Rahn's Termination

Tensions between Rahn and Kaps came to a head after Rahn's transfer to the criminal division. After the transfer, Rahn stepped up her letter writing activities. On September 28, 1999, Rahn wrote a letter to Judge Paul Hamre on the prosecutor's letterhead, expressing her concerns regarding the legality of the merger. Judge Hamre responded, thanking Rahn for her letter and dismissing her concerns on the grounds that the merger was the product of informed decisions by the proper elected officials. Unsatisfied by this response, Rahn wrote back to Judge Hamre on September 30, again using the prosecutor's letterhead. In her second letter, Rahn asked the judge to provide the legal authority for the merger. This second letter drew a swift rebuke from Judge

Hamre, who refused her request and instructed her to communicate any further concerns through the Prosecuting Attorney.

On October 8, 1999, Rahn met with Kaps for her weekly review. At this meeting, Kaps asked Rahn if she was "through with letter writing" and asked her to stop using the prosecutor's letterhead for letter writing connected with her opposition to the child support and paternity restructuring. He also asked her not to do anything to undermine his authority as Prosecuting Attorney. Kaps suggested to Rahn that if she wanted to object to the restructuring, she should do so as a private citizen and on a statewide level, rather than as pertained to Van Buren County.

Rahn must have misunderstood what Kaps meant by pursuing the matter on a "statewide level," because her next step was to write a letter, this time on her own letterhead, to Wallace Dutkowski, the director of the Michigan Office of Child Support. The October 15 letter to Dutkowski accuses the Van Buren County Friend of the Court of "undertak[ing] prosecutorial litigation obligations in child support cases without legal authority, contrary to existing ethical regulations and opinions and in violation of federal law regarding separation of powers." On October 21, 1999, Rahn wrote a letter to the Director of the State Court Administrator's Office, warning that the merger threatened "a number of seeming ethical and legal violations." The letter asked for information regarding the involvement of the State Court Administrator's Office, and specifically Deja. in the merger.

All indications suggest that, amid this flurry of letter writing, Rahn's work performance as an assistant prosecutor was suffering. Kaps grew concerned about her chronic tardiness and her regular practice of keeping her office door closed, which Kaps believed would deter law enforcement officers from feeling comfortable coming into her office to discuss cases. Chronic lateness soon became chronic absence. Early in November. Kaps confronted Rahn with her absenteeism, eventually suspending her for three days without pay for failing to call in to explain her absences. While Rahn was suspended, Kaps entered her office to find neglected work on her desk. After Rahn's suspension, Kaps placed her on paid leave and eventually terminated her employment.

### 4. Procedural History

On March 20, 2000, Rahn filed a complaint claiming, *inter alia*, that the defendants had violated her rights under the First Amendment, and had entered a conspiracy to violate those same rights, in violation of 42 U.S.C. §§ 1983 and 1985. At the close of discovery, all defendants filed motions for summary judgment. On January 7, 2002, the magistrate judge issued a Report and Recommendation that the district court grant the defendants summary judgment on Rahn's federal claims, and dismiss the state law claims she had sought to include under the supplemental jurisdiction of the federal courts.

The magistrate judge concluded that Rahn's letter writing touched on a matter of public concern. He noted, in particular, Judge Hamre's admission in his September 30 response to Rahn that county officials had debated the "pros and cons" of the issue. The magistrate judge concluded that because the issue was capable of inspiring debate among public officials, it could fairly be characterized as a matter of public concern.

Nevertheless, the magistrate judge found that the state's interests outweighed Rahn's right to First Amendment protection. He noted first, that elected prosecu-

tors generally have wide discretion to manage their offices. He explained that Michigan law provides that assistant prosecutors serve at the pleasure of the elected prosecutor. Citing our opinion in *Monks v. Marlinga*, 923 F.2d 423, 425–26 (6th Cir.1991), the magistrate judge found generally that a prosecuting attorney in Michigan retains "wide discretion to terminate the employment of prosecutors." Moreover, the magistrate judge concluded, a prosecuting attorney in Michigan also may demand loyalty from assistants. As a result, the magistrate judge concluded, an assistant prosecutor in Michigan is entitled to "substantially less First Amendment protection ... than a lower level employee."

Finding that Rahn's actions under the circumstances "could certainly erode defendant Kaps' confidence and trust in plaintiff," the magistrate judge concluded that Rahn's speech interest did not outweigh Kaps's interest in managing his office. Because she could not establish that Kaps's actions violated her First Amendment rights, the magistrate judge concluded that her claims against all other defendants failed as a consequence. As none of Rahn's federal claims could withstand summary judgment, the magistrate judge recommended that the district court dismiss Rahn's state law claims for lack of jurisdiction. The district court reviewed the magistrate judge's findings and conclusions *de novo*. and, over Rahn's extensive objections, adopted the report in its entirety.

## DISCUSSION

### 1. Standard of Review

A district court's decision to grant summary judgment is subject to *de novo* review. *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 521 (6th Cir.1997). Summary judgment is appropriate when "the plead-ings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of showing that no genuine issue of material fact remains in dispute. *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 861 (6th Cir.1986). The moving party does not, however, need to produce evidence showing the absence of a genuine issue of material fact. Instead, "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the [ ] court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At the summary judgment phase, the facts, as well as any inferences that can be drawn from them, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether a factual issue is genuine for the purposes of summary judgment in most civil cases, a court must decide "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 2. Rahn's Letter Writing Activities Touched on a Matter of Public Concern

The district court properly determined that Rahn's speech activity touched on a matter of public concern. In *Connick*, the Supreme Court indicated generally that speech touches on a matter of public concern when it relates to "any matter of political, social or other concern to the

community." *Connick,* 461 U.S. at 146. It is the content of the speech, rather than the motive of the speaker, that resolves the question of whether the speech relates to matters of public concern.

> Even if a public employee were acting out of a private motive with no intent to air her speech publicly, as was the case with Myers [the plaintiff in *Connick* ], so long as the speech relates to matters of "political, social or other concern to the community," as opposed to matters "only of personal interest," it shall be considered as touching upon matters of public concern.

*Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1052 (6th Cir.2001).

In some instances, the employee's speech activity concerns a mix of public and personal matters. *See, e.g., Connick,* 461 U.S. at 140–41 (after objecting to transfer within office, assistant prosecutor generated survey which partly asked respondents's opinions on internal matters, but also asked whether respondents felt pressured to work in political campaigns); *Banks v. Wolfe County Bd. of Educ.,* 330 F.3d 888, 891 (6th Cir.2003) (after having been passed over for teaching position in public elementary school, sending written complaint letters regarding hiring process to state agency); *Bonnell v. Lorenzo,* 241 F.3d 800, 804–05 (6th Cir.2001) (reacting to having been named in sexual harassment complaint, plaintiff, a college professor, distributed redacted copies of complaint and eight-page satirical essay to students, faculty and media outlets). If any aspect of a speech activity that gives rise to an adverse employment action touches on matters of public concern, the court must apply the *Pickering–Connick* balancing test. *See Bonnell,* 241 F.3d at 812 (citing *Kennedy v. Tangipahoa Parish Library Bd. of Control,* 224 F.3d 359, 366 (5th Cir.2000)).

■ The district court correctly concluded that Rahn's letters touched on matters of public concern because they raised issues that "that involved a matter of public policy that could be debated among public officials and which resulted in the elimination of the prosecutor's child support division." The defendants do not strongly challenge this finding, but do allude to "evidence suggesting that Rahn was motivated by her own personnel disputes and grievances...."

While Rahn's personal motivations may have some relevance, the focus of the analysis remains on the content of the speech. *See Banks,* 330 F.3d at 894 (citing *Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564 (6th Cir.1997)) (explaining that "the subjective intent of the speaker, while relevant, is not a controlling factor"). The defendants's suggestion that the letters were motivated by Rahn's personal concerns, even if accurate, is insufficient for us to conclude that the letters did not touch on matters of public concern. *See Bonnell, supra.* Although the defendants identified some facts in the record indicating that Rahn pursued her letter writing activity out of a self-serving motive, the district court was nonetheless correct in determining that Rahn's letter writing touched on a matter of public concern.

### 3. *Kaps's Management Interest Outweighed Rahn's Speech Interest*

■ Even so, Rahn has failed to show, as required by the controlling Supreme Court precedents in this area, that her interest in conveying her message outweighed her employer's interest in managing his office. *Pickering* requires, according to *Connick,* "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick,* 461 U.S. at 150.

Generally, where an employee's conduct is so disruptive that it unduly hinders a government entity's ability to satisfy its duties to the public, then that conduct is not entitled to First Amendment protection. *See id.* at 151 (citing *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J. concurring)). Moreover, "when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Id.* at 151–52.

Under Michigan law, an assistant prosecuting attorney serves at the pleasure of the prosecuting attorney. MICH. COMP. LAWS ("MCL") § 49.42 (2003). The phrase is commonly understood to mean that assistant prosecuting attorneys, like other political appointees, enjoy little job security to protect them from the "whims of each administration." *James v. City of Burton,* 221 Mich.App. 130, 133, 560 N.W.2d 668, 670–71 (Mich.Ct.App.1997). The *Pickering–Connick* test applies with full vigor in cases in which the employee is a political or "policy-making" appointee, but the employer may be entitled to even more deference where the employee is terminable-at-will. *See Connick,* 461 U.S. at 140 (noting that plaintiff served at the pleasure of defendant district attorney); *see also Monks v. Marlinga,* 923 F.2d 423, 426 (6th Cir.1991) (holding that politically motivated discharge of assistant prosecutors in Michigan does not offend First Amendment).

Although Rahn's letter writing touched on a matter of public concern, Kaps's interest in managing his office nevertheless outweighed Rahn's interest in conveying her message. Rahn raises two perceived problems with the district court's *Pickering–Connick* analysis. She first contends that the district court erred by failing "to give sufficient weight to the First Amendment rights which [she] possessed," and

therefore, that the district court granted summary judgment on an insufficient showing of governmental interest. Second, she maintains that, as a matter of law, the district court could not have concluded that the Prosecuting Attorney's interests could have outweighed her First Amendment rights because her letter writing was intended to expose unlawful activity in the workplace. Rahn maintains that, because of the nature of her speech, her interests are "co-extensive" with those of the employer. Each of these contentions is without merit.

Rahn maintains that where the speech "substantially involves matters of public concern," the defendant must be subjected to some greater showing of countervailing governmental interest than in the ordinary case. The thrust of her argument is that the district court assigned too much weight to Kaps's interests in having loyal and trustworthy employees. She also intimates that the district court erred in ignoring Kaps's reasons for firing her–that disloyalty was pretense for retaliation against an employee who was seeking to expose official malfeasance.

Rahn, however, runs directly into *Connick.* In that case, an assistant prosecutor, serving at the pleasure of the district attorney, objected to the reassignment of her job responsibilities to a different department within the office. *Connick,* 461 U.S. at 140. After her objections fell on deaf ears, she quietly began asking her peers how they felt about the transfer. *Id.* at 141. After one of her colleagues suggested that the other assistant prosecutors did not share her objections, she decided to prepare a survey of her colleagues, seeking their views on several internal office matters. *Id.* The survey did, however, contain one question that asked the assistant prosecutors if "you ever feel pressured to work in political

campaigns on behalf of office supported candidates?" *Id.* at 141, 155.

The same day the plaintiff distributed her survey, the district attorney terminated her employment. *Id.* at 141. His proffered reasons were that she had refused to accept the transfer and that she was insubordinate when she distributed the survey. *Id.* The district attorney primarily objected to two questions on the survey: (1) whether the assistant prosecutors "had confidence in and would rely on the word" of certain supervisors in the office, and (2) the political campaigning question. *Id.* The Supreme Court nevertheless held that the district attorney's interests outweighed the plaintiff's.

Although Rahn may maintain that her letter writing was not necessarily as disruptive as the survey in *Connick,* Rahn's conduct nevertheless had the "clear potential for undermining office relations." *Id.* at 152. For example, Kaps cited Rahn's October 21, 1999, letter to the State Court Administrator's Office as one incident giving rise to his decision to fire her. Kaps noted that in the letter Rahn "questioned the integrity of the Circuit Judge and at least indirectly that of the Friend of the Court, Sharon Deja, and myself." A reasonable person could have concluded that those statements questioned the veracity of those involved in the child support restructuring in Van Buren County and may have impugned the integrity of a judge before whom her job may require her to appear. Therefore, Rahn's activities were certainly undermining her ability to work as an assistant prosecuting attorney. Furthermore, having at least questioned the veracity of Kaps, he reasonably could question her loyalty. This letter could be characterized as one that would undermine office relations.

Relying on language from *Cockrel,* Rahn urges the panel to reverse the grant of summary judgment because Kaps affirmatively told Rahn that she could pursue her concerns on a "statewide basis." Under *Cockrel,* if the public employer approves or encourages the speech activity, it cannot later be heard to assert that the speech was disruptive. *Cockrel,* 270 F.3d at 1054–55. Rahn, however, ignores the undisputed fact that, in the same conversation in which Kaps told Rahn she could pursue the matter on a statewide basis, he also instructed her not to undermine his authority. Implicit in his permission for her to pursue the matter on a statewide basis was an expectation that if she did pursue her concerns on a statewide basis, that she would not do so in a manner that could be expected to undermine Kaps's authority. When she went to the State Court Administrator's Office, she referred specifically to Van Buren County and portrayed the officials involved in the restructuring process as disingenuous. This is not the situation in which Kaps, with full knowledge of what Rahn intended to do, approved the activity and then, after the fact, discovered that it was damaging to workplace morale. Instead the letter to the State Court Administrator's Office referred specifically to Van Buren County and called into question the veracity of county officials. Rahn exceeded the scope of the approval Kaps gave her to pursue her concerns, and therefore, *Cockrel* does not apply.

*Connick,* however, is directly on point. The Court explained that:

> This is not a case where an employee, out of purely academic interest, circulated a questionnaire so as to obtain useful research. Myers acknowledges that it is no coincidence that the questionnaire followed upon the heels of the transfer notice. When employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker,

additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office.

*Connick*, 461 U.S. at 153. Similarly, Rahn did not pursue her letter writing out of a detached interest in the legal and ethical implications of the restructuring of child support and paternity matters in Van Buren County. Rahn's letters clearly arose from her disagreement with her employers about policies that applied to her own job. Although she wrote the State Court Administrator's Office after her job was phased out, it can be connected in the same chain of activities relating to her disagreement with Kaps about whether the FOC could conduct prosecutorial tasks. Kaps could easily have perceived Rahn's pursuit of the matter with judges and state officials, after receiving an unsatisfactory answer from Kaps, as a direct challenge to his authority.

Rahn further maintains that, because she was speaking out against allegedly unlawful practices in the Prosecuting Attorney's office, her interests are "co-extensive" with those of the government, and therefore, the governmental interest can never outweigh them. This argument is unavailing. In support of her point, she cites *Marohnic v. Walker*, 800 F.2d 613 (6th Cir.1986), and *Williams v. Kentucky*, 24 F.3d 1526 (6th Cir.1994), but neither case compels the conclusion that Rahn's speech interest outweighs Kaps's management interest.

*Marohnic* involved retaliation against an employee who agreed to aid an investigation of fraud within a government agency. *Marohnic*, 800 F.2d at 614. After Marohnic aided the investigation, his employer began reprisals against him that eventually forced him out of the workplace. *Id.* Marohnic sued and entered a settlement agreement with the employer, but the em-ployer then gave Marohnic false negative references so that he would be unable to get a new job. *Id.* at 615. In reversing the district court's grant of summary judgment, the court held that Marohnic's speech did not hinder the operation of government because it was intended to stamp out fraud within the agency. *Id.* at 616. The court went on to explain:

> [W]hen an employee exposes unscrupulous behavior in the workplace, his interests are co-extensive with those of his employer; both want the organization to function in a proper manner.

*Id.*

*Williams* is similar in that, as in *Marohnic*, the plaintiff was a witness to official corruption and participated in a government investigation after being approached by law enforcement authorities. *See Williams*, 24 F.3d at 1530–31. Rahn. on the other hand, developed personal doubts regarding the ethical and legal implications of a practice in the office, and those doubts were *debatable*. Moreover, Rahn never suggests that there is anything criminal about the FOC handling of child support prosecutions. At most, she complained that the situation could pose ethical problems for attorneys handling child support cases. If she was seriously concerned about exposing herself to potential discipline, she should have sought an ethics opinion from the bar. It is undisputed that she did not.

## CONCLUSION

Having found that the district court was correct in its conclusion that Rahn's termination did not violate her rights under the First Amendment, we also agree with the district court's conclusion that Rahn's conspiracy claim cannot survive. Moreover, as Rahn has no surviving federal claims, the district court properly dismissed her state law claims. Therefore, we AFFIRM

the judgment of the district court in its entirety.