**Kimberly DRAPER, Plaintiff,**

v.

**LOGAN COUNTY PUBLIC LIBRARY,
et al., Defendants.**

**No. CIV.A. 1:02–CV13–R.**

United States District Court,
W.D. Kentucky,
Bowling Green Division.

Aug. 29, 2005.

Francis J. Manion, Geofrey R. Surtees, New Hope, KY, for Plaintiff.

Charles E. English, Jr., English, Lucas, Priest & Owsley, Bowling Green, KY, Thomas A. Noe, III, Russellville, KY, for Defendants.

## MEMORANDUM OPINION

RUSSELL, District Judge.

This matter is before the Court upon cross-motions for summary judgment (Dkt. Nos. 9 & 10). The parties having each responded (Dkt. Nos. 15 & 16) and replied (Dkt. Nos. 17 & 18), this matter is now ripe for adjudication. For the reasons that follow, both motions are **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

Plaintiff Kimberly Draper is a former employee of the Logan County Public Library. Ms. Draper began working at the library in August 1998. Draper performed a variety of tasks at the library, including securing inter-library loans, assisting patrons at the front desk, processing new materials entering circulation, and repairing work library books. While much of Ms. Draper's work involved working with library patrons, some of her work was performed outside the view of patrons.

Prior to her August 1998 hire, Plaintiff had been a library volunteer, which had her preparing crafts, participating in the library's story hour, and performing tasks for a library employee, Robin Emberton. As a volunteer, Ms. Draper would spend sixteen to twenty hours per week at the library. Draper frequently wore religious T-shirts during this time.

Before being hired as a paid library employee, Ms. Draper was told by Linda Kompanik, library director, that she could no longer wear the religious T-shirts that she had worn as a volunteer. The basis

for this restriction was found in the library's dress code, which provided:

> The library staff shall always be neat in appearance. Shorts are not allowed unless during special occasions so designated by the director. *No clothing depicting religious, political, or potentially offensive decoration is permitted.* Hats or caps are not permitted. All extremes of dress are to be avoided. Costumes may be worn when promoting a library program or theme.

(Dkt. # 9, Exh. D (emphasis added).) Ms. Draper understood the dress code policy to mean that she needed to dress professionally, and it was her understanding that she would be allowed to wear religious jewelry, such as crosses and angels, which she had seen librarians wearing during her time as a volunteer.

At least a year after Ms. Draper's hire, Ms. Kompanik amended the dress policy to prohibit religious ornaments as well: "No clothing *or ornament* depicting religious, political, or potentially offensive decoration is permitted." (Dkt. # 9, Exh. E (emphasis added).) This new policy, which was not given to Draper at the time of the change, still remains in effect at the library.

On April 3 or 5, 2001, Plaintiff returned to the library after a week's vacation. Sometime later in the day, she went into the office of Sherryl Appling, the library's assistant director. Ms. Appling noticed Draper wearing a cross on her necklace and told her to remove it. Appling told Ms. Draper that she could wear the cross under he clothing, believing that this would remedy any possible offense to library patrons.

On April 11, 2001, Draper again reported to work wearing the cross necklace. Assistant director Appling told Ms. Draper that she had spoken with director Kompanik about the cross and that Draper should remove it until speaking with Ms. Kompanik. Plaintiff responded that she believed she had the right to wear the necklace; Ms. Appling then told Plaintiff that she would have to remove the necklace or be sent home for the day. Ms. Draper elected to go home.

On April 16, 2001, Draper met with Kompanik. The two discussed the prior incidents involving Appling and the cross pendant, and Kompanik told Draper that Draper's refusal to remove the cross after being told by a superior to do so constituted insubordination. Ms. Kompanik then stated that she believed Draper had quit her job by leaving work. Ms. Draper replied that she had no intention of quitting and would have to be fired, and Ms. Kompanik then fired Draper.

Ms. Draper filed the instant suit on February 1, 2002 against the Logan County Public Library, the library's Board of Trustees, Linda Kompanik, and Sherryl Appling.[1] Her cause of action is rooted in 42 U.S.C. § 1983, alleging violations of the free exercise and freedom of speech protections of the First Amendment and the due process protections of the Fourteenth Amendment.[2]

## STANDARD

Summary judgment is available under Fed.R.Civ.P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions

---

1. Both individual defendants were named in both their official and individual capacities, while the Board of Trustees was sued in its official capacity only.

2. Her motion also argues a Fourteenth Amendment equal protection theory. This claim was not alleged in her complaint, and thus has not been considered in resolving the instant motions.

on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.1996). The plaintiff must present more than a mere scintilla of evidence. To support his position, he must present evidence on which the trier of fact could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## DISCUSSION

### I. Free Speech

■ Ms. Draper, an employee of the Logan County Public Library, is a public employee.[3] *See Stevens v. Bd. of Library Trustees of Cherry Valley Pub. Library Dist.*, No. 95 C 50160, 1997 WL 436227 (N.D.Ill. July 15, 1997). For a public employee to establish a claim for violating her

rights under the Free Speech Clause, she must demonstrate:

(1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir.2002) (quoting *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir.2000)) (alterations in original).

Here, it is apparent that Ms. Draper suffered a sufficiently adverse action. Her firing would certainly chill a person of ordinary firmness from engaging in similar conduct. Further, the facts reveal that Ms. Draper's firing was motivated at least in part in response to her display of the cross necklace. While Defendants argue that it was Ms. Draper's belligerence in challenging the library's dress code rather than her display of the cross necklace that led to her dismissal, Draper's actions arose directly from her disagreement with the policy and her desire to wear her cross necklace at work. The real dispute, therefore, is whether Plaintiff was engaged in a constitutionally protected activity by wearing the cross necklace.

■ For her display of the cross necklace to have been constitutionally protected speech,[4] Ms. Draper's actions must sat-

---

**3.** *Ms. Draper does not surrender her free speech rights simply by virtue of accepting employment with a public entity. As the Sixth Circuit recently noted,*

It is well established that a government employer cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression. As a logical consequence, retaliation by a government em-

ployer against an individual who exercises his First Amendment rights constitutes a First Amendment violation. This is the case even if the employee could have been terminated for any reason.

*Perry v. McGinnis*, 209 F.3d 597, 604 (6th Cir.2000) (citations and quotation marks omitted).

**4.** It is beyond serious dispute that private religious speech is protected by the Free

isfy two requirements. First, her actions must fall within the category of constitutionally protected conduct known as "expressive conduct" or "symbolic speech." This requires that she have intended to convey a particularized message by displaying the cross pendant, and that her act have had a great likelihood of being understood by those who view it as carrying her intended message. *Texas v. Johnson*, 491 U.S. 397, 404, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Second, Ms. Draper must show that her conduct touches on a matter of public concern. *Cockrel*, 270 F.3d at 1048. If Ms. Draper can satisfy these two requirements, the burden shifts to the government to demonstrate that Draper's interest in speaking on this matter of public concern is outweighed by its interest, as her employer, in "promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Leary*, 228 F.3d at 737); *see Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (citing *Connick*, 461 U.S. at 150, 103 S.Ct. 1684) (burden on employer in balancing test).

■ It is readily apparent that Ms. Draper's outward display of her cross pendant falls within the purview of expressive conduct. She stated that she wears a cross "to give witness to [her] religious faith."[5] And it can hardly be debated that her display would be understood by viewers as carrying her intended message. Indeed, the Christian cross is one of several inherently expressive religious symbols that cannot seriously be considered to ever be devoid of message. *Congregation Lubavitch v. City of Cincinnati*, 997 F.2d 1160, 1164 (6th Cir.1993) ("[A]t this late date it cannot be argued that the display of such an object as a menorah or a cross is not 'symbolic speech' that is protected by the free speech provisions of the First Amendment."); *see, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (burning crosses); *Knight Riders of Ku Klux Klan v. City of Cincinnati*, 72 F.3d 43 (6th Cir.1995) (cross bearing the message: "John 3:16").

Having demonstrated that her display of the cross pendant constituted expressive speech, Ms. Draper must now show that this expressive speech touched on a matter of public concern. This requirement exists because:

> [s]peech on [matters of public concern] is protected because the First Amendment is concerned not only with a speaker's interest in speaking, but also with the public's interest in receiving information. In fact, the core value of the Free Speech Clause of the First Amendment is the public interest in having free and unhindered debate on matters of public importance. It is *because* of this core value that it is essential that public employees be able to speak out freely on questions of public concern without fear of retaliation.

*Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 574 (6th

---

Speech Clause of the First Amendment. *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995).

5. Contrary to Defendant's assertion, Ms. Draper's declaration does not contradict her deposition testimony. In her deposition, Draper stated that she exercised a "personal choice" to wear the cross necklace "to remind [her] that Jesus died for [her] on the cross so [she doesn't] have to go to hell when [she] die[s]." (Draper Depo. at 80.) She did not state, however, that she wore the cross for no other reason or that she did not intend to communicate any other message. Thus, Ms. Draper's deposition testimony, which she may explain, *see Keller v. United States*, 58 F.3d 1194, 1198 n. 8 (7th Cir.1995), is not necessarily inconsistent with her subsequent declaration.

Cir.1997) (citations, quotation marks, and alterations omitted).

In determining whether contested speech addresses a matter of public concern, a reviewing court must question "the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1189 (6th Cir.1995). Thus, speech that can "be fairly considered as relating to any matter of political, social, or other concern to the community" is protected, while speech involving matters "only of personal interest" is not. *Cockrel*, 270 F.3d at 1052 (citing *Connick*, 461 U.S. at 149–49, 103 S.Ct. 1684). The Seventh Circuit has characterized the distinction between public and private speech as "the difference between an employee complaining about matters private to himself, such as whether he was being paid enough or given deserved promotions, as compared to an employee who is engaged in whistle blowing or otherwise going public with matters in which the public might be expected to take an interest." *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir.1995) (citing *Eberhardt v. O'Malley*, 17 F.3d 1023, 1026 (7th Cir.1994)). The phrase "public concern," does "not mean matters of transcendent importance, such as the origins of the universe or the merits of constitutional monarchy; [it] mean[s] matters in which the public might be interested, as distinct from wholly personal grievances . . . and casual chit-chat." *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir.1996).

▪ In examining this distinction, a court must look to the "content, form, and context of a given statement, as revealed by the whole record." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th Cir.2001) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The proper inquiry is *what* the speaker intended to communicate, not *why* the speaker intended to communicate that message. *Chappel*, 131 F.3d at 575; *Dambrot*, 55 F.3d at 1187. Thus, when examining whether the speech's message relates to a matter of public concern, the declarant's personal motive for speaking—whether civic-minded or self-serving—is a relevant, but not dispositive, consideration. *Vaughn*, 269 F.3d at 716–17; *Chappel*, 131 F.3d at 574–76.

▪ Relatedly, the public concern inquiry is an individualized one, and the mere fact that an employee's speech involves a topic traditionally considered of public import does not necessarily mean that the speech is on a matter of public concern. *See Gragg v. Ky. Cabinet for Workforce Development*, 289 F.3d 958, 966 (6th Cir. 2002) (citing *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. 1684); *see also Jackson v. City of Columbus*, 194 F.3d 737, 746 (6th Cir.1999) ("The fact that an employee alleges discrimination on the part of a public employer is not itself sufficient to transform the dispute into a matter of public concern."). For example, "issues such as racism and sexism have long been considered matters of public concern, but merely mentioning them in a statement will not necessarily raise an employee's speech to the level of protected activity." *Perkins v. O'Malley*, No. 94 C 7029, 1996 WL 316894, at *4 (N.D.Ill. June 10, 1996). Put another way, "if the speech concerns a matter of public interest but the expression addresses only the personal effect upon the employee, then as a matter of law the speech is not of public concern." *Id.* at *5.

Illustrative of this distinction are two Sixth Circuit cases—*Hardy v. Jefferson Community College*, 260 F.3d 671 (6th Cir. 2001), and *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir.1995)—that reach

opposite conclusions in addressing similar speech. In *Hardy,* college professor Hardy used the terms "nigger" and "bitch" during the course of a class discussion on language and social constructivism. *Hardy,* 260 F.3d at 674–75. In *Dambrot,* plaintiff Dambrot, the head coach of Central Michigan University's men's basketball team, used the word "nigger" in two separate instances. First, in November 1992, Dambrot addressed the basketball team after a practice and stated that he wanted them to "play like niggers on the court" and that he wished there were more niggers on the basketball court, but said he did not want his players to act like niggers in the classroom. *Dambrot,* 55 F.3d at 1181. Second, in a locker room session two months later, Dambrot repeatedly used the word "nigger" in trying to motivate the team. *Id.* at 1180.

The relative Sixth Circuit panels found that Hardy's classroom speech was on a matter of public concern, while Dambrot's locker room speech was not. The *Hardy* court discussed the distinction between the two situations:

> The *Dambrot* court found it significant that "Dambrot's use of the N-word was intended to be motivational and was incidental to the message conveyed." *Id.* at 1187. Dambrot's argument that his speech was protected by academic freedom was rejected because it failed to "advance[ ] an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id.* at 1189. Unlike Dambrot's motivational use of the "N" word removed from any academic context, Hardy's · in-class use of the objectionable word was germane to the subject matter of his lecture on the power and effect of language. Moreover, this and the other offensive words were suggested by the students in the context of the discussion, not gratuitously used by Hardy in an abusive manner.

Because the essence of a teacher's role is to prepare students for their place in society as responsible citizens, classroom instruction will often fall within the Supreme Court's broad conception of "public concern." *See* Gregory A. Clarick, Note, *Public School Teachers and the First Amendment: Protecting the Right to Teach,* 65 N.Y.U. L.Rev. 693, 702 (1990) (arguing that "[a] teacher's speech both offers students ideas and arguments that may be very much a part of public debate and teaches students the process of rational discourse that allows them to participate meaningfully in public debate"). Hardy's lecture on social deconstructivism and language, which explored the social and political impact of certain words, clearly meets this criterion. Although Hardy's in-class speech does not itself constitute pure public debate, it does relate to matters of overwhelming public concern—race, gender, and power conflicts in our society. *See, e.g., Bonnell [v. Lorenzo ],* 241 F.3d [800] at 816 [ (6th Cir.2001) ] (holding that "the subject of profane classroom language which precipitates a sexual harassment complaint lodged against the instructor ... involves a matter of public import"); *Blum v. Schlegel,* 18 F.3d 1005, 1012 (2d Cir.1994) (holding that a law school professor's "speech advocating the legalization of marijuana, criticizing national drug-control policy, and debating civil disobedience on its face implicates matters of public concern").

*Hardy,* 260 F.3d at 679.

Two circuits have addressed religious speech and the display of religious articles, with opposite results. The Fifth Circuit, in *Daniels v. City of Arlington, Texas,* 246 F.3d 500 (5th Cir.2001), held that a police officer's act of wearing a small gold cross

pin on his uniform did not fit within the "public concern" mold. In evaluating whether the expressive conduct's content, form, and context favored a finding of public concern, the court noted:

> The content of his speech—symbolic conveyance of his religious beliefs—is intensely personal in nature. Its form melds with the authority symbolized by the police uniform, running the risk that the city may appear to endorse Daniels's religious message. The final factor, context, perhaps weighs most heavily against Daniels.... Visibly wearing a cross pin—religious speech that receives great protection in civilian life—takes on an entirely different cast when viewed in the context of a police uniform. Although personal religious conviction—even the honestly held belief that one must announce such conviction to others—obviously, is a matter of great concern to many members of the public, in this case it simply is not a matter of "public concern" as that term of art has been used in the constitutional sense.

*Id.* at 504. At least one district court has taken a view similar to the Fifth Circuit, albeit with very little discussion on the issue. *See Moscowitz v. Brown,* 850 F.Supp. 1185, 1194 (S.D.N.Y.1994) (holding that plaintiff's wearing of religious articles while working as a police officer was "personal in nature." and "relate[d] to his own situation within the NYPD."), *abrogated on other grounds by Lauture v. Int'l Bus. Machines Corp.,* 216 F.3d 258 (2d Cir. 2000).

Conversely, the Ninth Circuit, in addressing an employee's challenge to a prohibition on his use of the phrase "Servant of the Lord Jesus Christ" and acronym "SOTLJC" on work material, rejected out of hand the governmental employer's "red herring" assertion that the employee's speech was not of public concern:

> [W]e reject the state's contention, which it makes without citing any supporting cases, that employee speech about religion is not on matters of public concern and thus is not protected workplace speech. This circuit and other courts have defined public concern speech broadly to include almost *any* matter other than speech that relates to internal power struggles within the workplace.... Here, the speech is religious expression and it is *obviously* of public concern.

*Tucker v. Cal. Dep't of Educ.,* 97 F.3d 1204, 1210 (9th Cir.1996).

The *Daniels* holding (as well as *Moscowitz* ) seems to irreconcilably conflict with the *Tucker* decision. Both cases dealt with outward expressions of personal religious faith, and neither decision involved proselytizing by the individual speaker. Yet, the two circuits reached opposite conclusions.

A closer review of the two cases reveals that the *Daniels* public concern analysis is flawed and that *Tucker* approach is more appropriate. *Daniels* seems to compress both the public concern analysis and *Pickering* [6] balancing of interests into a single step when discussing the form and context of Daniels's message. *See Daniels,* 246 F.3d at 504. Examining the risk of city religious endorsement and focusing on the fact that the speaker was uniformed, the Fifth Circuit erroneously considered the public employer's interest in suppressing

---

**6.** The balancing test mentioned *supra* and discussed. *infra* (in which the speaker's interest in speaking is measured against the government's interest as employer in managing the workplace) is commonly referred to as the *Pickering* test for its origin in *Pickering v. Bd. of Educ. of Township High School Dist. 205, Will County, Ill.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

the speech as relevant to whether the speech touched upon a matter of public concern. Thus, at least that portion of the *Daniels* court's public concern analysis is flawed, and much of the persuasive value of *Daniels*'s public concern holding is called into question.[7]

Further, recent language from the Supreme Court tends to indicate that the term "public concern" is inclusive rather than exclusive:

> [W]e have applied *Pickering*'s balancing test only when the employee spoke *as a citizen* upon matters of public concern rather than *as an employee* upon matters only of personal interest. Thus private speech that involves nothing more than a complaint about a change in the employee's own duties may give rise to discipline without imposing any special burden of justification on the government employer. If, however, the speech does involve a matter of public concern, the government bears the burden of justifying its adverse employment action. Respondents' expressive activities in this case fall within the protected category of citizen comment on matters of public concern rather than *employee comment on matters related to personal status in the workplace.* The speeches and articles for which they received compensation in the past were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment.

*Nat'l Treas. Employees' Union,* 513 U.S. at 466, 115 S.Ct. 1003 (second emphasis added) (citations and quotation marks omitted). The fact that the Supreme Court itself emphasized the distinction between citizen and employee speech, as well as the fact that the Court defined public concern speech by contrasting it from "matters related to personal status in the workplace," lends support to a broad, inclusive view of the term. *See also Hardy,* 260 F.3d at 679 (noting that the U.S. Supreme Court has employed a "broad conception" of the "public concern" term of art).

█ In the instant case, Draper's speech bears some characteristics of both public and private concern speech. Her cross was an external manifestation of her personal religious beliefs, which, as the *Daniels* court recognized, is "intensely personal in nature." However, a person's individual political party affiliation could also be viewed as intensely personal in nature, since political ideology is an unmistakably individualized choice; yet there is no doubt that a button bearing the words "Go Dems!" or "Proud Republican" would constitute public concern speech. Ms. Draper's symbolic, non-verbal cross display "is an expression of her personal religious convictions and viewpoint, which is a matter of social and community concern entitled to the full protection of the First Amendment." *Nichol v. Arin Intermediate Unit 28,* 268 F.Supp.2d 536, 558–59 (W.D.Pa.2003). Further, Draper's symbolic expression comes not as part of an employment grievance, but as part of her

---

7. Notwithstanding the instant criticism of the *Daniels* public concern analysis, the case's ultimate result was appropriate. Even assuming that Daniels's speech fit the public concern requirement, it could not survive the *Pickering* balancing analysis. *See Daniels,* 246 F.3d at 504. The unique need for impartiality and uniformity in law enforcement uniforms, coupled with the facially-neutral prohibition on wearing decorations on a police uniform shirt, ensures that the restriction survives First Amendment scrutiny. *Cf. Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (Air Force officer's free exercise rights not violated by neutral military regulation prohibiting him from wearing yarmulke with his uniform, given military's need for uniformity of dress).

long-standing practice of her religious beliefs. It "has nothing to do with the employment environment or the terms or conditions of employment, except indirectly to the extent the public employer now has prevented plaintiff from expressing her religious beliefs while at work." *Id.* at 560. On balance, Ms. Draper's public display of her religious convictions, although certainly not front page news, is religious expression that implicates the public interest enough to be considered public concern speech. *See Tucker,* 97 F.3d at 1210.

It is also significant that Ms. Kompanik and Ms. Appling both viewed Ms. Draper's religious symbolic speech as speech on a matter of public concern. The library dress code, enacted by Ms. Kompanik and implemented by Ms. Appling, regulated a particular form of expression—wearing religious, political, or "offensive" ornamentation or clothes—*because of* the effect of that expression and its message upon the public. Simply put, the library dress code was enacted, and was applied to Ms. Draper, because of a fear of public ire. In light of the government's obvious concern with public opinion in enacting and enforcing the policy, the natural conclusion is that Ms. Draper's expression was one of public concern.

■ Ms. Draper having established that her expressive conduct was speech on a matter of public concern, Defendants now bear the burden of establishing that the governmental employer's interest in carrying out its essential functions in an effective and efficient manner outweigh Draper's interest in speaking. *Rankin,* 483 U.S. at 388, 107 S.Ct. 2891; *Cockrel,* 270 F.3d at 1048. In analyzing this balance, the Court must consider whether Ms. Draper's religious expressive conduct would "meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer,

create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Williams v. Kentucky,* 24 F.3d 1526, 1536 (6th Cir. 1994).

In weighing the competing interests, courts have "given substantial weight to government employers' reasonable predictions of disruption." *Waters v. Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). Certainly, an employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." *Connick,* 461 U.S. at 152, 103 S.Ct. 1684. Nevertheless, the government must demonstrate that the danger to its efficient operation is real, and that its restriction will alleviate this danger in a direct and material way. *Nat'l Treasury Employees Union,* 513 U.S. at 475, 115 S.Ct. 1003 (quoting *Turner Broadcasting Sys., Inc. v. FCC,* 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)). For

> [a]s Justice Brandeis reminded us, a "reasonable" burden on expression requires a justification far stronger than mere speculation about serious harms. "Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women.... To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced."

*Id.* (quoting *Whitney v. California,* 274 U.S. 357, 376, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring)).

■ Additionally, the balancing test recognizes that "the government as employer ... has far broader powers than does the government as sovereign." *Waters,* 511 U.S. at 671, 114 S.Ct. 1878. Indeed, a governmental entity "may impose re-

straints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large." *United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 465, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995).

■ In support of the library dress code, Defendants make two central arguments. First, they argue that the policy is necessary to protect librarian impartiality on issues that could be the subject of patron inquiry. (Dkt. # 15 at 18–19.) Second, Defendants aver that the policy is required to avoid the appearance of religious favoritism and to avoid violating the state's duties under the Establishment Clause. (*Id.* at 19–20.) Defendants also contend that the policy's restrictions are narrowly drawn to serve these two interests with minimal intrusion upon library employee's First Amendment rights. (*Id.* at 20.) In support of this assertion, Defendants point out that the policy does not regulate what employees write or say, and that it does not govern employee off-duty conduct. (*Id.*) Finally, although the policy does not expressly so provide, Defendants argue that the library allows employees to keep reminders of their religious convictions on their person so long as those religious items are not openly displayed. (*Id.*)

■ Here, the Defendants have not sufficiently established that the library's efficiency interest outweighs Ms. Draper's free speech interest. Because the dress code represents a broad deterrent on speech that prospectively restricts expression and thereby chills potential speech before it happens, the government must meet a heightened burden in justifying the policy. *Nat'l Treasury Employees Union,* 513 U.S. at 468, 115 S.Ct. 1003; *Tucker,* 97 F.3d at 1210–11 (citing *Nat'l Treasury Employees Union,* 513 U.S. at 468, 115 S.Ct. 1003). Yet, Defendants have pre-sented no evidence to move the library's concern from the speculative and hypothetical to the real and concrete. Indeed, the evidence in this case indicates that Plaintiff's wearing of her cross was neither disruptive nor controversial until the library dress code made it a source of contention between Ms. Draper and Kompanik and Appling. It is simply beyond credibility that an employee's personal display of a cross pendant, a star of David, or some other minor, unobtrusive religious symbol on her person would interfere with the library's purpose. As such, the library's policy is based upon nothing more than "undifferentiated fear or apprehension of disturbance [which] is not enough to overcome the right to freedom of expression." *Hardy,* 260 F.3d at 681 (quoting *Tinker v. Des Moines Indep. Sch. Dist.,* 393 U.S. 503, 508–09, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).

Even assuming that the library's fear of disruption is well-founded, Defendants cannot show that the policy will alleviate the danger in a direct and material way. While the policy targets dress and ornamentation, it makes no effort to restrict arguably the most disruptive form of religious expression, verbal religious speech. For example, the policy prohibits library employees from wearing cross necklaces, but leaves them free to harangue library patrons about religious doctrine. Certainly, a library patron would be no less uncomfortable when faced with a proselytizing librarian than with one who merely visibly wears a small, unobtrusive display of religious support. Further, the policy is ill-suited to meet the library's stated goals.

Additionally, Defendants' Establishment Clause defense is unavailing. Without question, the contrary burdens imposed by the Establishment Clause and the Free Exercise and Free Speech Clauses sometimes requires government to walk a

fine line between laws impermissibly "establishing" religion and those impermissibly expressing hostility toward religion. This fine line of neutrality toward religion requires the government to distinguish between "*government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (quoting *Bd. of Educ. of Westside Community Schools v. Mergens ex rel. Mergens,* 496 U.S. 226, 250, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990)). At times, the state's interest in avoiding an Establishment Clause violation may provide justification for infringing upon free speech or free exercise rights otherwise protected by the First Amendment.[8] *See Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 112–13, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993); *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). Additionally, where the government acts in its capacity as employer, the government must be afforded some leeway in its effort to avoid transgressing Establishment Clause limits:

> The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise [and Free Speech] Clause[s] that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though … all instrumentalities of government[ ] must observe the basic free exercise rights of [their] employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

*Marchi v. Bd. of Coop. Educ. Servs. of Albany,* 173 F.3d 469, 476 (2d Cir.1999).

■ The Establishment Clause is not offended by governmental action if (1) the action has a secular purpose, (2) its principal or primary effect neither advances nor inhibits religion, and (3) it does not create an excessive entanglement of the government with religion. *Baker v. Adams County/Ohio Valley Sch. Bd.,* 310 F.3d 927, 929 (6th Cir.2002) (per curiam) (citing *Lemon v. Kurtzman,* 403 U.S. 602, 612–13,

---

**8.** Although it is unclear whether such an interest can justify viewpoint-based discrimination, *Good News Club,* 533 U.S. at 113, 121 S.Ct. 2093 (declining to address the issue), the deference shown the state in its role as employer suggests that even content-based restrictions, in some circumstances, could be permissible.

91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). The second prong of this three-part test may be evaluated by looking at "whether a reasonable observer would believe that a particular action constitutes an endorsement of religion." *Id.* (quoting *Adland v. Russ,* 307 F.3d 471, 479 (6th Cir.2002)).

The Court need only make a cursory review of the facts of this case to determine that the Defendants' Establishment Clause concern is invalid. Permitting library employees to wear her cross pendants and other unobtrusive displays of religious adherence would not have a religious purpose, would not excessively entangle the government with religion, and, most importantly, could not be interpreted by a reasonable observer as governmental endorsement of religion. A different conclusion might be justified if, for example, the library allowed employees to actively proselytize or if it permitted religious banners or slogans to be hung from the rafters. There is simply no danger that Defendants might face an Establishment Clause violation because of Draper's conduct or similar conduct of her co-workers. Even under the deferential review of the *Pickering* analysis, Defendants' Establishment Clause defense is unpersuasive. Accordingly, the library's dress code violates Plaintiff's rights under the Free Speech Clause of the First Amendment.

## II. Free Exercise

The Free Exercise Clause of the First Amendment, made applicable to the states by the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), bars government from "prohibiting the free exercise" of religion. U.S. Const. amend. I. The protections of the Free Exercise Clause are invoked if the challenged governmental rule of conduct "discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Such rules of conduct that are neither neutral nor of general applicability therefore "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." [9] *Id.* at 531–32, 113 S.Ct. 2217.

It is beyond serious dispute that the library dress code at issue here singles out religion (albeit while also singling out political and offensive speech).[10] It expressly prohibits clothing or ornaments with a religious meaning. Thus, it would seem that the dress code is invalid unless the library can show a compelling interest for the rule

9. Defendants cite *Vernon v. City of Los Angeles,* 27 F.3d 1385 (9th Cir.1994), for the proposition that a plaintiff alleging a Free Exercise claim must show that the government has placed a substantial burden on his free exercise of religion. (Dkt. # 10 at 5.) *Vernon,* in turn, cites *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), as providing the foundation for the "substantial burden" requirement. The *Sherbert* test, however, was rejected as the measure for a Free Exercise Claim in *Employment Div., Dep't of Human Resources of Ore. v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), so neither *Vernon* nor its resurrection of the "substantial burden" test is good law in the present context. *See Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 170–71 & n. 31 (3d Cir.2002). In fact, to the extent that the *Sherbert* test remains viable at all, its dominion is restricted to situations where the state already has an individualized evaluation system in place, such as the unemployment compensation context.

10. Defendants argue that the dress code is neutral because it does not distinguish among religions, but instead only distinguishes between religious and non-religious symbolic speech. Because the code takes the speech's content into account, it cannot be neutral.

and demonstrate that it is narrowly tailored.

However, as discussed previously, "the government as employer ... has far broader powers than does the government as sovereign," enjoying a "freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large." *Waters*, 511 U.S. at 671, 114 S.Ct. 1878. Consequently, it logically follows that a governmental employer should not be subjected to this rigorous standard of proof when it restricts the free exercise rights of its employees in the employment context.

Recognizing this distinction, many courts have retreated from the typical strict scrutiny review to adopt some other less rigorous analytical framework in public employment free exercise cases. The Third Circuit has applied an intermediate level of scrutiny—requiring the government action to be substantially related to an important governmental interest—in the public employment context. *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365–66 & n. 7 (3d Cir.1999); *see also Tenafly Eruv Ass'n*, 309 F.3d at 166 n. 27 (citing *Fraternal Order of Police* ). Other courts have applied the *Pickering* balancing test used in public employment free speech jurisprudence. *See, e.g., Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir.1995) (en banc); *Baz v. Walters*, 782 F.2d 701, 708 (7th Cir.1986); *Shahar v. Bowers*, 836 F.Supp. 859, 866 (N.D.Ga.1993), *aff'd*, 114 F.3d 1097 (11th Cir.1997) (en banc). Some courts have applied *Pickering's* test to situations involving religious speech without specifying whether they were evaluating a free speech or free exercise claim. *See, e.g., Lumpkin v. Brown*, 109 F.3d 1498, 1500–01 (9th Cir.1997).

The Sixth Circuit, however, has never expressly adopted a test for examining free exercise religious speech claims arising in the governmental workplace. Notwithstanding, the Court concludes that the Sixth Circuit would apply a *Pickering*-like standard of review to free exercise challenges to conduct rules of a governmental employer.

The policy justifications for applying a less stringent standard of review in the governmental employment arena are every bit as compelling in the free exercise context as in the free speech context. According to the Supreme Court in *Waters*,

the extra power the government has in [the employment] area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. The reason the governor may, in the example given above, fire the deputy is not that this dismissal would somehow be narrowly tailored to a compelling government interest. It is that the governor and the governor's staff have a job to do, and the governor justifiably feels that a quieter subordinate would allow them to do this job more effectively.

The key to First Amendment analysis of government employment decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of effi-

ciency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate.

*Waters*, 511 U.S. at 674–75, 114 S.Ct. 1878. The same policy rationale that allows the governmental employer to act more freely in restricting the free speech rights of its employees applies equally to afford the governmental employer similar leeway in limiting its employees' free exercise rights. Indeed, a *Pickering*-like balancing test has been used in several other employment contexts, including situations involving the right of expressive association, *see Hatcher v. Bd. of Pub. Educ.*, 809 F.2d 1546, 1559 (11th Cir.1987), the right of intimate association, *see Shahar v. Bowers*, 114 F.3d 1097, 1103 (11th Cir.1997) (en banc), the right to petition, *see White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir.1993), and Fourteenth Amendment privacy rights, *see Fyfe v. Curlee*, 902 F.2d 401, 405 (5th Cir.1990); *Stough v. Crenshaw County Bd. of Educ.*, 744 F.2d 1479, 1481 (11th Cir.1984). This varied application reveals that the government's role as an employer transcends many specific areas of constitutional jurisprudence to categorically lower the government's burden in cases challenging its actions as an employer.

Additionally, although the Supreme Court has never expressly addressed the level of scrutiny applicable to governmental regulation of employee free expression, the Court has applied a less rigorous test to a religion-neutral military dress regulation challenged on free exercise grounds. *See Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986). In *Goldman*, an Air Force officer challenged a military regulation that, by forbidding headgear from being worn indoors with the military uniform, prohibited him from wearing a yarmulke while in uniform. *Id.* at 505, 106 S.Ct. 1310. The Court, based upon the tenet that judicial "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society," opined that "courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Id.* at 507, 106 S.Ct. 1310. It then gave such deference to the "considered professional judgment" of the Air Force that uniformity in military uniforms and eliminating individual distinctions except for military rank were vital to troop obedience, unity, commitment, discipline, and *esprit de corps. Id.*

While not directly on point, the *Goldman* holding lends further support to the premise that a more relaxed free exercise measurement is appropriate when the government regulates conduct not of its citizens as a sovereign, but of its employees as an employer. Consequently, this Court determines that where a governmental employee's free exercise claim is one ordinarily subject to strict scrutiny review, the government's special role as employer mandates that the action be reviewed not under the strict scrutiny lens, but using a *Pickering*-like balancing test.

With a *Pickering*-esque test appropriate for measuring governmental employer conduct against the duties imposed by the Free Exercise Clause, the Court finds the policy is deficient for the same reasons that the policy cannot survive the *Pickering* analysis in the free speech context. Consequently, the dress code violates the Free Exercise clause of the First Amendment.

### III. Vagueness

Plaintiff also contends that the dress code is impermissibly vague, in violation of

her rights under the Due Process Clause of the Fourteenth Amendment. A statute is unconstitutionally vague if it is so vague and standardless that fails to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Vague laws are objectionable for three primary reasons. First, they trap the innocent by failing to provide fair warning of what conduct is prohibited. *Id.* Second, they impermissibly delegate basic policy matters to lower level officials for resolution on an *ad hoc* and subjective basis, with the attendant risk of arbitrary and discriminatory application. *Id.* at 108–09, 92 S.Ct. 2294. Third, when vague laws involve First Amendment freedoms, they operate to chill the exercise of those freedoms. *Id.* at 109, 92 S.Ct. 2294.

■ Where the government is acting as employer, it is permitted to impose restrictions upon its employees that would be unconstitutionally vague if generally applied. For example, "a public employer may ... prohibit its employees from being 'rude to customers,' a standard almost certainly too vague when applied to the public at large." *Waters,* 511 U.S. at 673, 114 S.Ct. 1878. In light of this reality, the Court concludes that the dress code is not unconstitutionally vague. While Kompanik and Appling demonstrated some inconsistency in what they viewed as "religious" clothing or ornamentation, the term "religious" is not too vague as to defy categorization. Any irregularity in application may be remedied through the grievance process. After all, the constitution must tolerate a certain amount of vagueness. "Condemned to the use of words, we can never expect mathematical certainty from our language." *Grayned,* 408 U.S. at 110, 92 S.Ct. 2294. Consequently, Draper's

Fourteenth Amendment Due Process claim must fail.

## IV. Qualified Immunity

■ In civil suits for monetary damages, governmental officials are entitled to qualified immunity for discretionary acts that do "not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *see Anderson v. Creighton,* 483 U.S. 635, 638–39, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). To determine whether qualified immunity is implicated, a court is to apply a two-part sequential analysis. First, the court must decide whether, viewing the facts in the light most favorable to the plaintiff, a constitutional violation has occurred. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). As explained above, this first requirement has been satisfied in the present case.

Because Plaintiff has established that her constitutional rights were violated, "the next, sequential step is to ask whether the right was clearly established." *Id.*

> In determining whether a constitutional right is "clearly established" at the time of the actions in question we look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth Circuit], and finally to decisions of other circuits. The standard for qualified immunity depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. Therefore, for a plaintiff to make a successful § 1983 claim, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. Although it need not be the case that the very action

in question has previously been held unlawful, in the light of pre-existing law the unlawfulness must be apparent.

*Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996) (internal citations, quotations, and alterations omitted).

The requirement that a right be "clearly established" is to be equated with a requirement that public officials have fair warning that their conduct violates the plaintiff's constitutional rights. *United States v. Lanier,* 520 U.S. 259, 269–72, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Because a right must be clearly established to defeat an assertion of qualified immunity, the doctrine gives public officials " 'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 902 (6th Cir.1998) (quoting *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)).

 After a review of the facts at present, the Court cannot say that Draper's right to wear her cross pendant while at work in the library was clearly established at the time of her termination. Certainly, it is clearly established that a state may not discharge an employee on a basis that infringes the employee's interest in free speech. *Matulin v. Village of Lodi,* 862 F.2d 609, 612 (6th Cir.1988). However, Draper's display of the cross pendant involved a situation implicating the vast gray morass where a governmental employee's First Amendment rights under the Free Exercise and Free Speech Clauses collide with the Amendment's Establishment Clause limitation upon government endorsement of religion. As is discussed above, the actions of Ms. Kompanik and Ms. Appling violated Ms. Draper's constitutional rights. But under the circumstances presented here, the contours of Ms. Draper's rights were not sufficiently clear that a reasonable government official would understand that prohibiting Draper from wearing her necklace while on duty at the library violated her rights. Accordingly, neither "plainly incompetent" nor "knowingly violating the law," Kompanik and Appling are entitled to qualified immunity, and the individual capacity suits against them must be dismissed.