**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0631n.06

No. 12-5945

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jul 03, 2013
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LORNA FLEMING, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF KENTUCKY |
| | ) | |
| FLAHERTY & COLLINS, INC., | ) | **O P I N I O N** |
| aka Flaherty & Collins Properties, | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |

BEFORE:     COLE and COOK, Circuit Judges; KATZ, District Judge.[*]

COLE, Circuit Judge.  Plaintiff-Appellant Lorna Fleming appeals the district court's grant of summary judgment in favor of Defendant-Appellee Flaherty & Collins Inc. ("F&C"), a property management company, on Fleming's claim of wrongful discharge.  According to Fleming, F&C fired her from her position as regional property manager for refusing to falsify business records in violation of public policy as evidenced by Kentucky Revised Statute § 517.050.  We affirm the grant of summary judgment.

I.

F&C, a corporation with its principal place of business in Indiana, manages properties for third-party owners.  In 2003, F&C hired Fleming, an Ohio resident, as a property manager of a single

---

[*]The Honorable David A. Katz, United States District Judge for the Northern District of Ohio, sitting by designation.

property and later promoted her to regional property manager, a supervisory role in which Fleming oversaw several property managers from F&C's Covington, Kentucky office. In her new role, Fleming reported to general manager Kristin Quinn who, in turn, reported to Jill Meals-Herron, the Vice-President of Property and Asset Management for F&C. Among other properties, Fleming was responsible for Trails of West Chester and Lakota Pointe, both of which she alleges were "financially distressed."

Fleming claims that "the entire time" she worked for Quinn, Quinn "[c]onsistently" told her to "advise" her property managers to "fluff their [occupancy] numbers" so that occupancy rates "on paper" would remain above ninety percent at all times. Specifically, Fleming claims that Quinn told her to instruct her property managers to refrain from recording when a tenant moved out until a replacement tenant was found. Fleming claims she did not do this. Fleming describes her relationship with Quinn as "[p]rofessional, friendly" and her relationship with Meals-Herron as "very good" until July 2006.

Fleming received several disciplinary warnings throughout 2006. Meals-Herron testified that her "first real frustration" began in February or March of 2006, after a property visit that revealed "dirtiness" and a separate incident in which Fleming allegedly inadequately responded to a shooting at one of Fleming's properties. Meals-Herron claims she wanted to terminate Fleming then, but held off. Among other things, Meals-Herron also testified that Fleming failed to market her properties and did not obtain receipts for property expenses from her property managers in a timely manner. Both, according to Meals-Herron, contributed to the low occupancy rates in Fleming's properties:

> If you need cash to go buy supplies to go turn the units and you spend your money and you get three units turned and now you want to turn three more, you got to turn those receipts in so you can get more cash so you can turn the next three units. If you don't turn in the receipts, you don't get cash to turn more units.

Fleming admits she failed to turn in timely receipts on at least one of her properties, and that her July 25, 2006 disciplinary warning for failing to "tie out"—submit— receipts was accurate.

In July 2006, Quinn allegedly asked Fleming why thirty-four tenant applications were pending at Trails of West Chester and why the prospective tenants were not being moved in. Fleming claims she answered that most of the applicants were failing the tenant screening process due to invalid social security numbers. Fleming testified:

> And [Quinn] said -- she looked at me and said, "You know what you need to do to fix that problem?" And I said, "What?" And she said, "You need to send those applicants over to Rita Chavez at Willows of Springdale "which is another sister property," and Rita can provide them with the false documentations needed to pass our screen criteria for the ID and Social Security verifications." When she said that I giggled, I kind of laughed. I'm like, get out of here. And she looked up at me and she said, "No, I'm totally serious. How do you think we got Willows of Springdale occupied?"

According to Fleming, she replied "I can't do that, Kristin," and never contacted Rita Chavez or otherwise attempted to obtain social security numbers for the problematic applicants. After that conversation, Quinn repeatedly urged her to "move them in," but never again referred to "sending [the tenants] anywhere."

After the July 2006 conversation about social security numbers, Fleming alleges her relationship with Quinn deteriorated. Quinn allegedly became "very curt" in her correspondence with Fleming, refused to offer professional guidance as she had done in the past, hid job-related communications from Fleming, thereby undermining her ability to do her job, and gave her more

work with shorter time frames. Also in July 2006, or slightly earlier, Meals-Herron took over direct supervision of Fleming.

Meals-Herron testified that she again wanted to terminate Fleming in October 2006 for poor performance. She had a termination agreement drawn up that was dated October 12, but ultimately did not proceed with termination at that time. The "final straw," according to Meals-Herron, came in November 2006, when one of Fleming's properties accumulated approximately $10,000 of late fees over two years. Fleming claims she did not pay the late fees because there was a "verbal" F&C policy not to do so. Quinn and Meals-Herron both deny the existence of such a policy, with Quinn clarifying that late fees were supposed to be paid only after being "researched" to see if they could be waived. Meals-Herron terminated Fleming on or about November 22, 2006.

On November 19, 2010, Fleming filed a diversity action in the district court, claiming wrongful discharge, age discrimination, and hostile work environment. Fleming dropped the latter two claims, and the district court granted F&C's motion for summary judgment on Fleming's wrongful discharge claim. Fleming appeals.

## II.

We review a grant of summary judgment de novo. *Cacevic v. City of Hazel Park*, 226 F.3d 483, 491 (6th Cir. 2000) (citation omitted). Summary judgment is warranted when, viewing the facts in the light most favorable to the non-movant, no reasonable jury could find in her favor. *See Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1048 (6th Cir. 2001) (citations omitted).

Generally, an employee in Kentucky is subject to discharge at-will, *see Mitchell v. Univ. of Ky.*, 366 S.W.3d 895, 898 (Ky. 2012) (citation omitted), but an employee can sue for wrongful

discharge under a "narrow public policy exception." *Nelson Steel Corp. v. McDaniel*, 898 S.W.2d 66, 68 (Ky. 1995) (citations omitted). An employee's discharge is actionable when it was caused by (1) "the failure or refusal to violate a law in the course of employment" or (2) "the employee's exercise of a right conferred by well-established legislative enactment." *Id.* at 69 (quoting *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985)).

Fleming claims she was fired for refusing to violate Ky. Rev. Stat. § 517.050, which says:

(1) A person is guilty of falsifying business records when, with intent to defraud, he:

> (a) Makes or causes a false entry to be made in the business records of an enterprise; or . . . .

> (c) Omits to make a true entry in the business records of an enterprise in violation of a duty to do so which he knows to be imposed upon him by law or by the nature of his position; or

> (d) Prevents the making of a true entry or causes the omission thereof in the business records of an enterprise.

According to Fleming, F&C wanted her to violate Ky. Rev. Stat. § 517.050 in two ways, and fired her for refusing. First, she alleges F&C directed her to "fluff" occupancy rates by delaying the recording of tenants who moved out. Second, she alleges that F&C directed her to refer prospective tenants to providers of fake social security numbers so that they would be able to "clear the tenant screening process." Fleming claims that her refusal to violate the law by following these two directives led F&C to terminate her in violation of public policy under Kentucky law.

The district court found that Fleming's refusal to misrepresent the occupancy rates of F&C-managed properties did not contribute to the termination decision. The district court based this conclusion on Fleming's "unequivocal[]" testimony that her refusal to do so did not affect her

relationship with Quinn. On appeal, Fleming does not dispute the district court's finding regarding causality. Given Fleming's testimony, we agree with the district court that no reasonable jury could conclude that Fleming's discharge was caused by her refusal to fluff occupancy rates.

As to Quinn's second alleged directive, regarding the acquisition of fake social security numbers, the district court found that, even if Fleming's refusal to obey *was* the cause of her termination, referring prospective tenants to a provider of fake social security numbers would not violate Ky. Rev. Stat. § 517.050 and therefore could not support a wrongful discharge claim under Kentucky law. The district court held that Fleming "fail[ed] to explain how" referring prospective tenants to Chavez would have violated Ky. Rev. Stat. 517.050, which requires "intent to defraud." The district court considered that Quinn might have been seeking to defraud the property owners, but rejected that possibility because the owners "would have benefitted from the higher occupancy rates" that resulted from more tenants passing screening. Fleming alleges two errors in the district court's handling of this issue.

First, Fleming argues that the district court erred in finding no intent to defraud, because the goal of referring applicants to Chavez would have been to defraud the Internal Revenue Service. According to Fleming, her properties' owners were eligible for tax credits under 26 U.S.C. § 42 if their tenants met certain income-related criteria, and Quinn was telling Fleming to encourage tenants to falsify such compliance by obtaining inauthentic social security numbers, and thereby defrauding the IRS. Even if Quinn directed Fleming to break federal law, that will not support a wrongful discharge claim under Kentucky law. *See Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. Ct. App. 2005) (citation omitted) (holding that a violation of federal regulations cannot support a

wrongful discharge claim under Kentucky law); *Clark v. Sanofi-Synthelabo, Inc.*, 489 F. Supp.2d 759, 771 (W.D. Ky. 2007) (citations omitted) ("[Kentucky's] public policy exception has been found not to apply to public policy enunciated in federal law."). Fleming must demonstrate that the request required her to violate a *Kentucky* statute or constitutional provision. *See Shrout*, 161 S.W.2d at 355. The only statute she claims to have been required to violate is Ky. Rev. Stat. § 517.050, of which "intent to defraud" is a necessary element.

The district court also did not err in finding that Fleming failed to establish that Quinn's request required her to violate Ky. Rev. Stat. § 517.050. In Kentucky, the six elements of fraud are: "a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). Fleming fails to demonstrate the first element of intended fraud. Although Quinn may have asked her to make or encourage a misrepresentation, Fleming does not identify why this misrepresentation would have been *material* to obtaining § 42 tax credits to which property owners would otherwise not be entitled. Fleming herself stated to the district court that "the program does not require that a tenant be a legal resident of the United States . . . [but] an owner may elect to establish such a criteria as part of its resident selection plan," and she testified that her concern was the illegality of "harboring illegal immigrants." Furthermore, Fleming waived the argument that the IRS was the intended victim of fraud by failing to raise it before the district court. *See Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) ("Our function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order." (quotation marks omitted))

Second, Fleming argues that, even if there was no intent to defraud, the district court should have considered Fleming's potential criminal liability for violating Ky. Rev. Stat. § 517.050. Since Fleming has not established that referring applicants to Chavez would have led to the violation of Ky. Rev. Stat. 517.050, it does not make sense that she could have had a fear of prosecution under that statute. Also, Fleming never made a "fear of prosecution" argument before the district court, so the district court cannot have erred in failing to consider it. *See Barner*, at 399 F.3d at 749.

III.

We affirm the judgment of the district court.